IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION


ANDREW SASSER                                           PETITIONER


v.                    CIVIL NO.: 4:00-cv-04036-JLH


RAY HOBBS, Director,
Arkansas Department of Corrections[1]              RESPONDENT

## O R D E R

Petitioner Andrew Sasser ("Sasser"), sentenced to death for murder and confined at the Maximum Security Unit of the Arkansas Department of Correction ("ADC"), seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996. Pet., ECF No. 48. After careful consideration, and for the reasons that follow, Sasser's remaining claim, that he is mentally retarded and thus ineligible for the death penalty, will be dismissed with prejudice.

## I.  Procedural History

### A.  Summary of Petitioner's Criminal Trial

On May 4, 1994, a jury convicted Sasser of capital murder and sentenced him to death for the homicide of Jo Ann Kennedy. *See Sasser v. State*, 902 S.W.2d 773 (Ark. 1995).

---

[1]   Respondent Ray Hobbs was officially named the Director of the Arkansas Department of Correction on June 26, 2010, terminating his position as "interim director." The Clerk of the Court is directed to amend the docket sheet accordingly.

1

At the jury trial, Sasser's guilty plea was not accepted by the trial court due to the state's refusal to waive the death penalty. *Id.* at 775. Sasser stipulated that he caused the death of the victim while in the possession of and while driving his brother's pickup truck. *Id.* Other stipulated facts included: Sasser stopped at the E-Z Mart in Garland City two or three times to buy chips and to use the telephone between the hours of 3:00 p.m. on July 11, 1993 and approximately 12:00 a.m. on July 12, 1993; the victim was discovered nude from the waist down; and the pants and panties found in the E-Z Mart's men's bathroom were hers. *Id.*

The State's first witness at trial, Jeanice Pree, testified she and her mother, Gloria Jean Williams, lived across the street from the Garland City E-Z Mart. *Id.* Pree testified she had an unobstructed view of the store. *Sasser*, 902 S.W. 2d at 775. Pree testified she also worked at the E-Z Mart and believed its front door was locked at 12:00 midnight and thereafter customers were required to use a drive-through window. *Id.* Pree testified she was sitting on her couch watching television when she looked out her window, saw the victim and a man behind the store counter and assumed he was a friend of the victim. *Id.* Pree testified she looked back and saw the victim and the man coming to the store's front door. *Id.* Pree testified she could tell the victim was being forced to come out because it looked like her hands were behind her

back. *Id.* Pree testified she telephoned 911. *Sasser*, 902 S.W.2d at 775. The police dispatcher testified he received Pree's 911 telephone call at approximately 12:46 a.m. on July 12, 1993, and that she stated "there was a woman that she believed was being killed at the E-Z Mart, being drug through the window." *Id.*

Gloria Jean Williams testified she watched the E-Z Mart from the window in her house while her daughter (Pree) telephoned 911. *Id.* Williams testified she saw a truck leave the store, and then the victim "came around from the side of the E-Z Mart. She reached for the door and she just collapsed, right there." *Id.*

Miller County Sheriff's Deputy Jim Nicholas testified the victim was found lying just outside the E-Z Mart door on the sidewalk, and appeared to be dead. *Sasser,* 902 S.w.2d at 775. Nicholas testified the victim was nude from the waist down, and what appeared to be her panties and pants were located in the men's restroom of the store. *Id.* Nicholas testified one of the victim's shoes was in the front aisle and one behind the counter, and a large wad of hair was found behind the cash register near the drive-through window. *Id.* Nicholas testified blood spatters were observed at the drive-through window, on the store's "outside aisles," counter, and on the men's bathroom wall. *Id.* at 775-76. Nicholas testified the drive-through window was open. *Id.* at 776.

Numerous items of physical evidence and photographs were introduced into evidence through the testimony of Nicholas and

Miller County Sheriff's Department Investigator Toby Giles, including a photograph of the drive-through window and cash register area showing two plastic containers of nachos. *Sasser*, 902 S.W.2d at 776.

Arkansas State Police Investigator Robert Neal testified he and Miller County Sheriff H.L. Phillips interrogated Sasser at the Lafayette County Sheriff's Office in Lewisville for approximately two hours beginning around 7:45 p.m., on July 12, 1993. *Id.* Sasser's tape recorded statement and a transcript of the same were introduced at trial and provided as follows. *Id.* Sasser stated he drove up to the window at the Garland City E-Z Mart and ordered nachos from the victim. *Id.* He described the victim as a "lady ... [who] had an attitude" and was angry because someone else had ordered nachos, then failed to pick up the order. *Id.* Sasser stated the victim tried to sell him two orders of nachos, but he declined. *Sasser*, 902 S.W.2d at 776. He stated they argued and the victim slammed the drive-through window on his hand. *Id.* Sasser stated he jerked the window open whereupon the victim cut him with an knife-like object with a blade. *Id.* Sasser stated he grabbed the victim and she jerked him through the drive-through window. *Id.* He stated they scuffled, moving from the drive-through window area, down the counter area, out into the store's interior, back to the store office at the rear of the store, and up to the potato chip rack at the front of the store.

-4-

*Id.* Sasser stated the victim opened the store's front door, they exited the store and the victim followed him to his pickup truck, still fighting. *Id.* Sasser stated he entered the vehicle and left. *Sasser*, 902 S.W.2d at 776.

Sasser stated he did not recall going into the E-Z Mart's restrooms but that he "had to go back there." *Id.* He stated the victim repeatedly hit him with her fists while they scuffled. *Id.* Sasser stated he wrested the victim's knife-like object from her and used it to hit her, finally dropping the object near the pickup truck. *Id.* Sasser stated he did not know why the victim's clothes were removed. *Id.* When asked whether he did not remove the victim's clothes or did not remember doing so, he replied: "No sir." *Sasser*, 902 S.W.2d at 776. Sasser stated he did not try to rape the victim or to rob her. *Id.*

The State's final witness, Ms. Carter, testified Sasser attacked and raped her on April 22, 1988 at the E-Z Mart Store in Lewisville. *Id.* Carter testified she was the only employee on duty when Sasser entered the store at approximately 1:00 a.m. and purchased cigarettes, returned fifteen minutes later and purchased a soft drink, then returned five minutes later, asked to use the telephone and stated he had a wreck on his motorcycle. *Id.* Carter testified Sasser then stood in the store after stating he was waiting on his wife to pick him up. *Id.* Carter testified that, at approximately 1:35 a.m., a truck drove up and appellant went

-5-

outside to talk to its occupants. *Sasser*, 902 S.W.2d at 776.
Carter testified she moved from behind the cash register and began
putting up items in the freezer when Sasser approached her from
behind and hit her on the back of the head with a soft-drink
bottle. *Id.* Carter testified she and Sasser struggled and he
continued to hit her, then forced her to a utility/bathroom located
at the back of the store. *Id.* Carter testified another man
approached and Sasser decided to take her out of the store. *Id.*
Carter testified Sasser forced her out of the store, picked up his
bicycle, and pushed Carter and the bicycle into an alley. Carter
testified that, when the other man drove by, Sasser forced her
across the street, told her to pull down her clothes, pulled down
his own clothes, and raped her. *Id.* Carter testified Sasser then
told her he should not have done it and should kill her, whereupon
she begged him not to and agreed to say a truck had dropped her off
and Sasser had found her. Carter testified Sasser forced her back
to the store where the police were waiting. *Sasser*, 902 S.W.2d at
776. Carter testified that, when she gained the opportunity to
speak privately to a policeman, she identified Sasser as her
attacker. *Id.*

The state then rested and the defense presented no evidence.
*Id.* The jury returned a verdict of guilty; the verdict did not
identify the predicate offense or offenses the jury found as a
required element of the crime of capital felony murder. *Id. at*

-6-

*776-77.* The state then introduced, for the jury's consideration in the sentencing phase, a certified copy of Sasser's 1988 convictions for Carter's second degree battery, kidnapping and rape. *Id. at 777.* The jury found one aggravating circumstance: that Sasser had previously committed another felony an element of which was the use or threat of violence to another person or creating a substantial risk of death or serious physical injury to another person. *Sasser*, 902 S.W.2d at 777. The jury found three mitigating circumstances: that Sasser would be a productive inmate, had a supporting family of him as an inmate, and had stipulated he caused the victim's death. *Id.* The jury found the aggravating circumstance outweighed any mitigating circumstances and justified the death sentence. *Id.*

### B.  State Court Appeal of Conviction

Sasser appealed his conviction to the Arkansas Supreme Court, raising one issue - whether the trial court abused its discretion when it permitted the state to introduce "prior acts" testimony in violation of Arkansas Rules of Evidence 404(b) and 403. *Id.* The Arkansas Supreme Court affirmed Sasser's conviction and sentence on July 17, 1995. *Id.*

### C.  State Post-conviction Relief

Subsequently, Sasser sought post-conviction relief pursuant to Arkansas Rules of Criminal Procedure 37. After conducting an evidentiary hearing, the circuit court denied Sasser's Rule 37

petition, in September 1997.  On July 8, 1999, the Arkansas Supreme Court affirmed the lower court's denial of post-conviction relief. *See Sasser v. State*, 993 S.W.2d 901 (1999).

### D.  Federal Relief - Writ of Habeas Corpus

On July 7, 2000, Sasser petitioned for a writ of habeas corpus in federal court.  Pet., ECF No. 3.  Throughout several pleadings, Sasser presented eight (8) claims upon which he requested relief. At that point, Sasser had not raised a mental retardation claim. On May 23, 2002, this Court denied Petitioner's Petition for Writ of Habeas Corpus.  Order, ECF No. 30.  This Court issued a Certificate of Appealability for five (5) of Sasser's claims, on August 15, 2002.  Certif.  Appeal, ECF No. 34.

While on appeal at the United States Court of Appeals for the Eighth Circuit (Eighth Circuit Court), Sasser raised, for the first time, the claim of mental retardation as a bar against his execution.  On August 21, 2003, the Eighth Circuit Court entered a judgment, remanding the mental retardation issue to this Court, and granted the motion to file a successive petition. J., ECF. No. 37.  On August 29, 2003, this Court entered a Scheduling Order, stating that this Court was to determine whether Sasser is mentally retarded and whether his execution in prohibited.  Sch.  Order, ECF No. 40.  This Court also stated that the appropriate standard for "mental retardation" is contained in ARK. CODE ANN. § 5-4-618.  *Id.*

-8-

Then, on March 9, 2004, the Eighth Circuit Court entered an Amended Judgement, revising the previously entered order and remanded the case to this Court for a determination of whether the mental retardation claim had been exhausted. Am. J., ECF No. 44. If this Court were to conclude that Sasser had a viable state court remedy, the Eighth Circuit Court went on to "invite" this Court to determine whether "truly exceptional circumstances" involving "a consideration going beyond the running of the statute of limitations" exist. *See id.* (citation omitted).

On September 3, 2004, Sasser filed a Second Supplemental and Amended Petition for Writ of Habeas Corpus Relief (the Petition). Pet., ECF No. 48. Sasser raised the mental retardation claim, alleging that Sasser's sentence to death by lethal injection violates the 8th and 14th Amendments. Sasser also raised an ineffective assistance of counsel claim; a claim that Sasser's statement to police was taken in violation of the 5th, 6th, and 14th Amendments, as it was involuntary in part due to Sasser's mental retardation; and that Sasser was incompetent during the trial and post-trial proceedings, and his counsel provided ineffective assistance on these matters. *Id.*

On November 5, 2004, Respondent filed a response. Resp., ECF No. 49. Sasser filed a reply on February 3, 2005. Reply, ECF No. 56. Additionally, on April 4, 2005, Sasser filed two affidavits from two licenced social workers as exhibits to the Petition. Ex.

-9-

1, ECF No. 58.

On June 14, 2006, this Court entered a Scheduling Order, Sch. Order, ECF No. 65, requiring any motions regarding "additional information Petitioner would like the Court to consider in relation to his mental retardation claim" be filed on or before August 31, 2006.  *Id.*

Sasser failed to file any motions regarding the introduction of additional information to support the mental retardation claim. Thus, on January 9, 2007, this Court entered an Order, Order, ECF No. 71, denying the Second Supplemental and Amended Petition for Writ of Habeas Corpus Relief in its entirety on the grounds that Sasser's mental retardation claim was procedurally defaulted because he did not raise the issue in state court under state law. *See also* J., ECF No. 72.

Sasser then filed a Motion to Alter Judgment pursuant to Fed. R. Civ. P. 59(e), Mot. ECF No. 73, which was denied on April 18, 2007.  Order, ECF No. 80.

A Motion for Certificate of Appealability was filed, Certif. Appeal, ECF No. 82, and the Certificate was granted in part and denied in part.  Order, ECF No. 84.  The Certificate was denied regarding any claims outside the alleged mental retardation, as the remand from the Eighth Circuit Court of Appeals was limited to issues involving the mental retardation claim.  *Id.*, *see also* Am. J., ECF No.   44.   The Certificate was granted regarding

-10-

Petitioner's claims he should not be subject to a sentence of death due to mental retardation, and Petitioner's claims of ineffective assistance of counsel.  Order, ECF No. 84.

After a petition for writ of certiorari with the United States Supreme Court was denied on October 29, 2009, Pet., ECF No. 90, this case was again remanded back to the district court on November 3, 2009 from the Eighth Circuit Court of Appeals.  Mandate, ECF No. 91.  The Eighth Circuit remanded "to the district court for an *Atkins* evidentiary hearing to adjudicate the merits of Sasser's mental retardation claim."  *Id.* at 11.

The Eighth Circuit disagreed with the procedural default analysis applied by this Court, because under the precedent of *Simpson v. Norris*, 490 F.3d 1029 (8th Cir. 2007), the ability of a petitioner to raise a similar state-statute mental retardation claim and failing to do so will not default an *Atkins* constitutional claim.  Mandate 8, ECF No. 91.  Moreover, Sasser had "alleged that he is mentally retarded as *Atkins* defines that condition," and was entitled to an evidentiary hearing on that claim.  *Id.* at 8-9.

The Eighth Circuit Court of Appeals concurred with this Court's reasoning that the ineffective assistance of counsel claim was not properly before it, and stated the review of the district court was limited to one issue, with prohibition from consideration of any other issue.  *Id.* at 9-10.  Additionally, the Eighth

-11-

Circuit stated that while a statute of limitations argument could be made regarding the mental retardation claim, the government had forfeited that defense by raising it for the first time on appeal, and the Eighth Circuit "will not address the defense any further." *Id.* at 11.

Pursuant to the Opinion and Mandate of the Eighth Circuit Court of Appeals, this Court held an evidentiary hearing regarding Sasser's claim of mental retardation for two days on June 15 and 16, 2010. *See* Mins., ECF Nos. 153, 154 and Tr., ECF No. 157. Respondent filed his post hearing brief on July 16, 2010, Hr'g Br., ECF No. 158, and Sasser filed his post hearing brief on the same date. Hr'g Br., ECF No. 159. Rely briefs were filed on July 30, 2010. Reply Br., ECF Nos. 161, 162.

## II. Applicable Law

In 1988, the United States Supreme Court held that there was not then a national consensus to bar the execution of those who were mentally retarded. *Penry v. Lynaugh*, 492 U.S. 302 (1989)(abrogated by, *Atkins v. Virginia*, 536 U.S. 304(2002)). However, when the high court again reached the question in 2002, it held that a national consensus had emerged, in the thirteen years since *Penry*, against the execution of mentally retarded offenders. *Atkins v. Virginia*, 536 U.S. 304 (2002).

In fact, while only two states barred the execution of mentally retarded persons at the time the Court decided *Penry*,

thirty states barred the practice at the time *Atkins* was decided in 2002.  *See Penry*, 492 U.S. at 334; *Atkins*, 536 U.S. at 314; *see also Roper v. Simmons*, 543 U.S. 551, 592 (2005) (O'Connor, J., dissenting).  Arkansas was one of the states mentioned by the Supreme Court to have passed legislation against executions of mentally retarded persons during the thirteen-year gap.  *Atkins*, 536 U.S. at 314 (enumerating state statutes enacted between 1989 and 2001 exempting the mentally retarded from the death penalty.).

The Court in *Atkins* went on to hold that the Eighth Amendment "'places a substantive restriction on the state's power to take the life' of a mentally retarded offender."  *Id.* at 321, *quoting Ford v. Wainwright*, 477 U.S. 399, 405 (1986).  The Court further implicitly rejected the suggestion in *Penry* that the death penalty could not be barred if any mentally retarded person might theoretically deserve it, so that the effect of mental retardation should instead simply be considered as a mitigating factor.  *Id.* at 318-19.  Rather, it said, the very fact that persons are mentally retarded not only makes them more likely to give a false confession, but also makes them less able to assist their counsel, typically makes them poor witnesses, and may cause them to exhibit a demeanor that is unsympathetic and that may incorrectly imply a lack of remorse.  *Id.* at 320-21.  The Court concluded that "death is not a suitable punishment for a mentally retarded criminal."  *Id.* at 321.

In *Atkins*, the Supreme Court refrained from imposing a definition of mental retardation, leaving that to the states. *Atkins*, 536 U.S. at 317.  However, the Supreme Court did cite two clinical definitions formulated by psychological associations, that of the American Association on Mental Retardation (AAMR) and the American Psychiatric Association.  *Id*. at 309, n.3.  Using the 1992 edition of the AAMR's definition, the Court presented mental retardation as

> substantial limitations in present functioning . . . characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.  Mental retardation manifests before age 18.

*Id.* at 318.

These three elements — subaverage intellectual functioning, limitations in adaptive skills and manifestation before age 18 — also appear in the 2000 edition of the American Psychiatric Association's definition, which states:

> [t]he essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C)." *Id.*
> The court explained that this definition added a quantitative measure, stating that "Mild' mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70.

*Id.*  The *Atkins* Court noted that state statutory definitions of mental retardation generally conform to these clinical definitions. *Id.*

Consistent with the language of the Supreme Court in *Atkins*, which found "we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences," *Atkins,* 536 U.S. at 318 (*quoting Ford*, 477 U.S. at 405, 416-17), Arkansas in *Anderson v. State*, 163 S.W.3d 333 (Ark. 2004), held that the Supreme Court's decision in *Atkins* was "merely reaffirming the States' preexisting prohibition against executing the mentally retarded." *Anderson*, 163 S.W.3d at 354-55.  Section 5-4-618(a)(2) of the Arkansas Code Annotated, which is part of Act 420 of 1993, provides that no defendant with mental retardation at the time of committing capital murder shall be sentenced to death.[2]

Arkansas Code Annotated Section 5-4-618 states in relevant part:

---

[2]  Sasser did not claim mental retardation in any state court proceeding.  As noted above in the background, *supra*, the Eighth Circuit stated this was not a procedural default of Sasser's *Atkins* claim, because *Atkins* was a new constitutional claim, despite the identical right conferred by state-statute.  Further, the Eighth Circuit made it clear in *Simpson v. Norris*, 490 F.3d 1029 (8th Cir. 2007), that there was no requirement to remand to the Arkansas Supreme Court to determine mental retardation, because the Arkansas Court had expressly stated it would not recall a mandate affirming a death sentence to consider a defense arising from *Atkins* of any capital defendant who failed to raise a similar defense under state law.  In other words, the Arkansas Supreme Court would consider the claim to be solely a federal one.  As a petitioner such as Sasser or Simpson would therefore be unable to present the claim in state court and receive a full and fair evidentiary hearing, such petitioners could satisfy the conditions of receiving an evidentiary hearing in federal court.

(a)(1) As used in this section, "mental retardation" means:
    (A)  Significantly  subaverage  general  intellectual functioning[3] accompanied by a significant deficit or impairment in adaptive functioning[4] manifest in the developmental period, but no later than age eighteen (18) years of age; and
    (B) A deficit in adaptive behavior[5].
  (2) There is a rebuttable presumption of mental retardation when a defendant has an intelligence quotient of sixty-five (65) or below.
(b) No defendant with mental retardation at the time of committing capital murder shall be sentenced to death.
(c) The defendant has the burden of proving mental retardation at the time of committing the offense by a preponderance of the evidence.

ARK. CODE ANN. § 5-4-618.

Neither the Federal Death Penalty Act, nor the federal Constitution, requires government to prove, by any standard, that a capital defendant is not mentally retarded; rather, it is up to states to determine how to enforce the constitutional prohibition against executing mentally retarded persons. *United States v. Webster*, 421 F.3d 308 (5th Cir. 2005). Arkansas has stated it is the petitioner's burden to prove mental retardation by a preponderance of the evidence. *Anderson*, 163 S.W.3d at 355. The parties in this case agree this is the standard to apply and that

---

[3] Intellectual functioning is defined by the intelligence quotient (IQ). AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (4th ed. 2003).

[4] Adaptive functioning refers to how effectively individuals cope with common life demands. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 42 (4th ed. 2003).

[5] Adaptive behavior refers to how well a person meets the standards of personal independence expected of someone of their particular age group, sociocultural background, and community setting.  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 42 (4th ed. 2003).

the Arkansas statutory provision controls.

### III. Evidence Presented

At the evidentiary hearing regarding Sasser's *Atkins* claim, this Court heard testimony from the following individuals in the following order: Mr. Hollis Sasser, Dr. Jethro Toomer, Prof. Tom Smith, Dr. Roger Moore, Mr. Grant Harris, Sgt. John Cartwright, Mr. Bryan Olinger, and Dr. Kevin McGrew. Along with the testimony of witnesses, Sasser submitted exhibits numbered 1-4, which consisted of the following:

Petitioner's Exhibit 1:  Report of Jethro Toomer, consisting of three volumes;

Petitioner's Exhibit 2:  Curriculum Vitae and report of Prof. Tom Smith;

Petitioner's Exhibit 3:  Report of Dr. McGrew and Appendix, consisting of five volumes.

Respondent submitted exhibits numbered 1-3, which consisted of the following:

Respondent's Exhibit 1:  Report, Raw Data, and Materials of Dr. Roger Moore, consisting of seven volumes;

Respondent's Exhibit 2:  Diagram showing correspondence between Sasser's test results and the normal distribution curve;

Respondent's Exhibit 3:  Arkansas Department of Finance and

Administration Driver Permit/License
Record for Sasser.

All of the exhibits presented by the parties have been throughly reviewed by the Court and will be summarized as appropriate to the discussion, section IV, *infra*.

The following is a summary of the evidence, which bears upon Sasser's cognitive and behavioral development and capacities, presented via witnesses at the *Atkins* hearing.

- Hollis Sasser ("H.B.") is a brother of Petitioner Sasser. When Sasser was two or three years of age, Sasser and H.B.'s father passed away after an on-the-job accident at a construction site.  The family, including Sasser, then moved to an area referred to as "Boyd Hill" where several family members also lived.

- Sasser socialized with other children his age, and children older and younger than him when living at Boyd Hill.

- Sasser was given chores to do, including feeding chickens by himself and gathering firewood with the family.

- Sasser would also fish with his family, using simple fishing equipment such as a pole and worm, but not fishing lures and tackle.  Sasser would also clean the fish.

- During high school, Sasser had a job with the Crank family. Sasser would help with farm duties in chicken houses and assisted with hay baling in the summer months.  Sasser was

-18-

specifically responsible for removal of dead chickens from the houses, cleaning out water troughs, and feeding chickens. Once the chickens were old enough for removal of the initial water troughs, Sasser would take out the troughs and wash them.

- All of Sasser's employment was in manual labor jobs.

- When Sasser was about eighteen years of age, he attempted to take a pay check he had been given by Mr. Crank, Sasser's employer, and alter the check to receive additional funds. The attempt at altering the check was "messy" and "quite obvious," according to H.B., who saw the check. When Sasser attempted to pass the check at a local store, the clerk knew the check had been altered and also personally knew Mr. Crank and Sasser and did not honor the check.

- Sasser did not date much when he was a teenager and a young adult. He never brought a girl home to introduce to the family and H.B. never saw him go out on a date or attempt to "flirt with a girl."

- Sasser continued to live with his mother while H.B. and the other siblings moved out of the family home.

- Sasser received a certificate of attendance for high school, but no actual diploma. H.B. was surprised to learn Sasser did not actually graduate high school.

- Sasser told everyone he was going to go into military service,

specifically the Army, but instead lived in an abandoned home 100 yards away from H.B.'s house at night and in the daytime would stay out of sight of everybody by hiding in a wooded area. Sasser would go approximately five to six hundred yards "up a hill" and hide during the daylight hours. On times Sasser knew the family would be away, such as Sunday church hours, Sasser would take canned goods from H.B.'s house for food. At the times when Sasser would get food from H.B.'s house, Sasser would also call his grandparents to keep up the ruse that he was in boot camp. The house where Sasser stayed at night had no running water or electricity, but it did have some furniture. To heat food, Sasser would make a campfire. The duration of Sasser's stay at the home was approximately three weeks.

- As a teenager, Sasser had a job babysitting for H.B's four children during the day while H.B. and his wife went to work. The children's ages ranged from one to nine years old. Sasser did not babysit overnight, nor did he ever cook for the children. Additionally, Sasser's mother was next door for extra supervision.

- As a young man, Sasser found himself out of work and needing a job. H.B. assisted Sasser in securing a common labor job with Young Construction. Sasser's job was putting together 20-foot joints of plastic pipe to lay sewer lines for the

city.  Sasser would apply an "ointment" type substance to the inside of the pipe, and then push the pipe to make certain the joints were placed together securely.  The pipe had to go in far enough to reach a certain point and it had to be straight for welding.  This job was supervised.  Sasser rode back and forth from this job with H.B.

- H.B. also assisted Sasser in securing a job at a lumber mill after Sasser returned home following a period of incarceration.  H.B. also transported Sasser to and from the lumber mill.  While working at the lumber mill, Sasser found an old truck he wanted to buy, so H.B. helped Sasser purchase the truck.  Sasser did not have any credit established so H.B. spoke with the loan officer and got a personal loan for Sasser.  Sasser just had to sign the paperwork.  H.B. did give the payment book to Sasser and it was Sasser's responsibility to make the payments on the loan.  Prior to this, Sasser had done no banking, had no checking account, and no savings account.

- Sasser lived with his mother except for the time he was incarcerated.  There was also short period of time when Sasser lived with Arch and Margie, his other siblings, due to employment at the Hudson chicken plant in Hope, Arkansas. Other siblings came back to the family home for short periods of time, but Sasser stayed there much longer.

-21-

- H.B. did not notice any significant developmental issues with Sasser as they were growing up.

- Dr. Jethro Toomer, a clinical and forensic psychologist, gave Sasser the Wechsler Adult Intelligence Scale, fourth edition ("WAIS-4") to assess Sasser's intellectual functioning. Dr. Toomer began the vocabulary sub-test at question five, due to Sasser's age, and gave Sasser credit for getting the first four questions correct, although those questions were not asked.

- Sasser received one point on question number 11 of the vocabulary sub-test. The score of one reflects an answer that is generally correct, but is characterized by what is called the poverty of content, which means the answer is vague and questionable if the person really understands.

- Some of the vocabulary sub-test questions are marked "DK" which indicates that Sasser simply did not know the answer and he could not provide any particular response to that particular item.

- On question 23 of the vocabulary sub-test, Sasser provided the response "different things" to the prompt of "diverse." According to the scoring guide, the next step is to query Sasser with his understanding of that particular term, because according to the manual, an understanding of the term diverse goes beyond just the notion of being different.

- When Sasser was questioned after giving this response, he was unable to provide any further clarification or indication of understanding the particular concept. Thus, he earned a score of zero. Dr. Toomer then stopped the exam because Sasser had given three consecutive answers which received a score of zero, and the rules require the examiner to stop after three consecutive scores of zero. The scoring manual, at page 45, states "[i]f the examinee spontaneously gives a zero or a one-point response that is appropriately queried but the examinee does not improve his or her response, the score retains its original value."

- According to the scoring manual "different things" was a one point score, and Dr. Toomer stated the answer was only worth one point if the examinee could properly respond to the subsequent query.

- On page 30 of the administration manual for the WAIS-4, it states "[a]ll 15 sub-tests have a single start point for all ages. Examinee suspected of intellectual disability, i.e. mental retardation or general intellectual deficiencies, should always begin with Item 1." Dr. Toomer maintained he was not predisposed to any particular belief that Sasser was mentally retarded, so he began with question five, and not question one. If Sasser had missed the questions beginning at question five, the instruction is to go back to be beginning

of the test and give questions one through five.

- The full scale IQ score for the exam administered by Dr. Toomer was an 83. Applying a standard margin of error, the range of this score would be 78-88. However, Dr. Toomer also maintained there would be a rise in the score, or an inflation of the score, due to the "artificial environment" of the prison. This inflation was not quantifiable.

- In 1994, Sasser was administered the Wechsler Adult Intelligence Scale Revised ("the WAIS-R,"), which was the test in effect at that time. However, that instrument had been normed in 1980. So, when Sasser took the exam in 1994, his score was not compared with peers, but with the group against which it was normed fourteen years prior. The concept of norm obsolescence, which can call into question the adequacy of a particular instrument, is also called the Flynn effect. The score on the examination can be adjusted for the Flynn effect, which results in roughly a three point inflation for every ten years. In 1994, Sasser's IQ score was 79. Taking into account the Flynn effect, his score would be 75. The standard error of measure would be plus or minus five points. Thus, the accurate IQ score for Sasser from the 1994 test would be the range of 70-80.

- Mental retardation also consists of adaptive functioning or adaptive deficits, which is a person's level of functioning in

community life, such as independent living.  This is compared with peer group members in the local community.  There is no instrument developed to do a retroactive functioning assessment.   In this case, a retroactive assessment is what is required because there is no instrument that would measure Sasser's adaptive functioning in the year 1994.

- The Scales of Independent Behavior Revised ("SIB-R"), is an instrument used to assess adaptive functioning deficits.  Generally, this instrument is a tool for planning a course of treatment.  The SIB-R has different levels of analysis and is well suited for retrospective determination of adaptive functioning deficits because it encompasses quantitative factors as well as qualitative factors.

- Using this instrument, Dr.  Toomer visited with Sasser's friends, family, and peers.  Specifically, those who would know Sasser's functioning within an age range prior to age 18.  Using the SIB-R to attempt a retrospective analysis, Dr. Toomer found Sasser had eight areas of deficiency in terms of adaptive functioning.  The areas of deficiency are as follows: social interaction skills, language comprehension, language expression, time and punctuality, money and value, work skills, home and community orientation, and social interaction. The AAMR requires deficiency or weakness in two areas of adaptive functioning to support a diagnosis of mental

retardation.

- A person with mental retardation can perform some tasks in these areas, but still have deficits.  For example, these individuals can hold jobs, get married, drive a car and have a driver's license, as well as have a relationship.  The upper level of mental retardation, under the DSM, is mild mental retardation.  The range of IQ for mild mental retardation is a range of 50 to 55 to 70.  The DSM describes borderline intellectual functioning as an IQ range from 71-84, generally.  Moreover, the DSM establishes that "[d]ifferentiating mild mental retardation from borderline intellectual functioning requires careful consideration of all available information" because the two can look similar.  Borderline intellectual functioning does not contain the qualitative component of adaptive functioning deficits.

- In assessing the evaluation with the SIB-R, Dr.  Toomer was inquiring about Sasser from people who had information as to his behavior prior to the age of 18.  Therefore, he did not interview Janet Thomas, who had a relationship with Sasser and is the mother of his child, although Ms.  Thomas knew Sasser at the time of the crime and his incarceration.  Further, when Dr.  Toomer utilized the software for scoring the SIB-R, he used the pre-eighteen years of age data, but assessed how Sasser actually functions in the present time.

- Dr. Toomer has testified in 18-20 cases since 2006 on the issue of mental retardation of an accused criminal defendant. In the cases where he testified, he found there was mental retardation. However, in some cases where he was retained he did not make a conclusion of mental retardation, but he was not called to testify in those cases.

- Professor Tom Smith, the dean of the College of Education and Health Professions at the University of Arkansas testified that in the 1970's programs for mentally challenged school children were just being implemented in Arkansas and were minimally funded. There were no record-keeping requirements on the part of school districts at that time.

- Dr. Smith never worked in the Lewisville school system, where Sasser was educated, and he did not review the IQ scores for Sasser. Dr. Smith also had no information on whether Sasser was served with a Title One program while in school or if Sasser was considered intellectually disabled while in school.

- Dr. Moore is a clinical and forensic psychologist who has practiced for about 15 to 16 years. He has testified in other federal court capital habeas proceedings for the respondent, including the *Simpson*[6] case in the Eastern District of Arkansas. In *Simpson*, Dr. Moore preformed a psychological evaluation and found Mr. Simpson met the statutory

---

[6] Simpson v. Norris, 490 F.3d 1029 (8th Cir. 2007).

-27-

requirements for mental retardation in Arkansas.  He has also preformed similar work throughout the country in federal and state cases in approximately three dozen *Atkins* cases for both the petitioner and respondent.  In at least three cases when hired by the state, Dr.  Moore determined the subject met the requirements of mental retardation.  Dr.  Moore also gave a presentation, along with the attorney general for the State of North Carolina, on the topic of handling experts in mental retardation trials on four different occasions in 2007.  Each presentation was to a District Attorney's Association or the Attorney General's Office.

- Dr.  Moore reviewed transcripts from school records, records from the Southwest Arkansas Counseling and Mental Health Center, written transcripts of police interviews, police interview reports, medical examiner's report, and telephone visitation records as well as interviewed over two dozen witnesses to evaluate whether Sasser meets the Arkansas standard for mental retardation.

- Dr.  Moore disregarded an IQ test given to Sasser by Ms.  Mary Pat Carlson due to issues with the assessment that called into question the reliability and validity of this exam.  The IQ score was higher than the 1994 score of 79, but Dr.  Moore found the administration of the test rendered it of questionable validity and reliability.

-28-

- Regarding the 1994 score of 79, the standard error of measure would indicate a confidence interval of 74 to 84.  For the 2010 score of what Dr. Moore believed to be an 84, but was given a score of 83, the confidence interval would be 78 to 88.

- Dr. Moore disagreed with Dr. Toomer's assessment of a zero score on Item number 23 of the vocabulary sub-test of the examination given in 2010.  Dr. Toomer awarded no score for the answer "different things" given by Sasser to the prompt of "diverse."  Dr. Moore testified the manual clearly states the response "different things" is a one-point response.  Dr. Moore agreed the response must be queried, but stated that a query can only retain the score originally awarded, or allow the individual to get a higher score.  As the original response of "different things" was a one-point answer, Dr. Moore disagreed that the answer could be deducted points to yield a score of zero, despite Sasser giving the same response upon a query.  Moreover, as this response was not a zero response, the test should not have been discontinued at that point.  The query also was not properly documented according to the test publisher's manual.

- In the field, when clinical psychologists are faced with test results involving aging norms, they will note the reliability of the scores may be reduced due to aging norms.  The best

practice is to use the most up-to-date test. The 2010 administration would be the most reliable because it was given within a year of the norming dates. If the Flynn effect was realized here, the 2010 results should be lower than the 1994 score. Wechsler manuals acknowledge Dr. Flynn's work regarding the increase in scores over time, however there is no recommendation to alter a score because of the potential impact of the Flynn effect. Adjusting a score downward is not generally accepted clinical practice. In fact, Dr. Moore testified he had only observed the IQ score adjusted downward for the Flynn effect in evaluations done by the defense in mental retardation hearings. The AAIDD states the best practice to diagnose mental retardation is to recognize the Flynn effect, and it is the primary organization of its kind that deals with the assessment and diagnosis of mental retardation.

- Also, Dr. Moore disagreed with the caution urged by Dr. Toomer as to artificial increases in the 2010 score due to Sasser being imprisoned in an "artificial environment." Dr. Moore found the contention that death row would lead to greater intellectual development to be "striking."

- Dr. Moore also looked for supporting data to the IQ scores, such as aptitude and achievement tests. These are not IQ tests, but are correlated with it, and these are measures of

cognitive functioning. Dr. Moore looked at the SRA[7], the AFQT[8], two WRATs[9], and the WIAT[10]. In 2010, Sasser's spelling sub-test score on the WRAT-4 was in the 18th percentile; the arithmetic score was in the 21st percentile; sentence comprehension was in the 30th percentile; and reading composite was in the 34th percentile. Dr. Moore placed the IQ scores, along with the other scores from instruments measuring Sasser's cognitive functioning along a bell curve, to determine if there was a convergence of data. Dr. Moore found the multiple exams mostly fall within the range between the two IQ scores, lending increased confidence those IQ scores are accurate. (Respondent's Exhibit 2). As a result, Dr. Moore concluded that Sasser had impaired cognitive functioning, but not mental retardation as defined under Arkansas law.

- Dr. Moore agreed with Dr. Toomer that Sasser displayed some deficits in adaptive functioning, however he disagreed those deficits were significant enough to meet statutory requirements. To be "significant deficits" under the statute, in clinical terms, Sasser would need to be functioning about

---

[7]   Science Research Associates Achievement Series

[8]   Armed Forces Qualification Test

[9]   Wide Range Achievement Test

[10]   Wechsler Individual Achievement Test

two standard deviations below the mean.  Also Dr.  Moore opined that Dr.  Toomer's administration of the SIB-R to retroactively assess deficits in adaptive functioning was not valid and reliable because 1) the age equivalent scores were not based on an individual's assessment of Sasser, they were a compilation of many different recollections and 2) because the age for the assessments varied, there is no indication of a specific age, but just a wide range of assessment across various ages.  Dr.  Moore did note that Sasser's overall level of adaptive functioning likely falls below the average to borderline range.  Adaptive functioning on the job would not mean a job required abstract thinking, but that the individual could show up on time and work independently without specific guidance.

- Grant Harris, the Assistant Director of Institutions with the Arkansas Department of Correction at the time of the hearing, was previously the warden of the Varner Supermax unit, which is the facility that houses death row inmates.  In this capacity he became familiar with Sasser.

- Previous to his conviction in 1994 which placed him on death row, Sasser was incarcerated in 1989 for an unrelated conviction.  He was processed in 1989 through the diagnostic unit, where he was given a medical evaluation, including an interview by medical health staff, and given an orientation to

-32-

the procedures for the Arkansas Department of Correction. Sasser completed orientation on February 16, 1989. From diagnostic, he was moved to the Cummins Unit on February 24, 1989. The two and a half week processing time at the diagnostic unit is typical for new inmates.

- All inmates physically and mentally capable are assigned a job, if an inmate chooses not to work, he or she is given a disciplinary. Work assignments take into consideration prior employment, institutional needs, education, and background. An inmate can receive a promotion to a better work assignment, or to a different Class. Class 2 inmates receive twenty days off their sentence for every month served, Class 1 inmates receive thirty days for every thirty days served, and can essentially cut their sentence in half.

- Sasser was initially assigned to the kitchen. He was then transferred to the Varner Unit in April and assigned to inside building utility and then to inside maintenance. Kitchen detail could include all aspects of food preparation, the actual work Sasser performed is not evident in the records. As part of the building utility crew, Sasser was responsible for cleaning including windows, mopping, and scrubbing walls. In about a month, Sasser moved to inside maintenance which is responsible for plumbing, electrical, wiring, leaks, and other similar duties. Sasser remained in this job for the duration

-33-

of his sentence which began in 1989, until he was transferred to the Wrightsville Unit in 1992. Inside maintenance is a sought-after job because the inmate can travel one end of the facility to another, including places where the inmates has contact with female staff.

- The level of supervision Sasser would have would depend on the tools he was using for a particular job. Class A tools are those which could be used in an escape attempt and require direct supervision. Class B tools are those which could not aid in an escape attempt and can be used with more autonomy.

- Sasser maintained his class 1 status for 12 months while on inside maintenance, he also was awarded meritorious good time for on-the-job training as an electrician and for showing "proficiency and excellence at his job as an electrician." This would mean Sasser was doing the job as required, and not abusing sick-call.

- When Sasser transferred to the Wrightsville unit in 1992, he was assigned to furniture manufacturing. Sasser was a saw operator. In this job, Sasser would have cut the wood down to the specifications for each piece to put together for assembly. Sasser was awarded good time credit for his performance as a saw operator. To receive the good time credit award, Sasser would have to have no re-cuts or wasted wood. He held this position for six months, then he

transferred to the pre-release program in December of 1992.

- Pre-release was designed for inmates within 90 to 120 days of release, to aid them in anything the inmates needed to know, or be trained on, for getting back into the "free world" and functioning there.  This includes classes on getting a driver's license, interview skills, how to balance a checkbook, and similar other aspects of daily life.  It is a highly motivated program, and an inmate has to want to be in it or he or she will be removed.  Sasser was in the pre-release program for three months.

- When Sasser returned to the Arkansas Department of Correction two years later, in 1994, as a death row inmate, he did not go through the diagnostic unit, but went straight to an isolation cell.  He was monitored closely for the first seven days and was given a handbook and told about the grievance process.  After that, Sasser was placed on death row and had no contact with the general population inmates.

- Sergeant John Cartwright was the maintenance supervisor at the Varner Unit when Sasser was a member of that work crew.  Cartwright would supervise up to eight inmates at a time and supervised Sasser for three years.  Cartwright remembered Sasser because he did a good job in the maintenance crew and there was never a problem with him.  In this job, Sasser was on call basically twenty-four hours a day.  He could get

-35-

called out at night to make a repair with the security guard of the unit.  Sasser had his own set of tools, kept separately from the tools of other inmates in a tool pouch or toolbox, and tools had to be counted before an inmate left a job, and then they were locked up until needed.  Sasser never lost a tool.  Carwright also recommended Sasser for good time credit due to Sasser's performance as a electrician.

- Brian Hollinger was hired to start the pre-release program at the Wrightsville unit.  This program was to help inmates make a transition to the real world, including computer training and interview skills.  The program would also help inmates get their taxes up to date, as well as study and sit for the written portion of the drivers license exam.  The driver's license portion consisted of two to three days in a classroom environment studying the driver's license manual, a practice test designed by Mr.  Hollinger, and then the actual examination administered by a state trooper at the Wrightsville unit.

- Sasser scored 100% on both the sign portion of the driver's license test and the written portion of the test.  He took the exam one time.  The driver's license exam is the only exam Sasser was given in pre-release.  There was no other evaluation done to see if Sasser understood the program as a whole.

-36-

• Dr. Kevin McGrew is the director of the Institute for Applied Psychometrics, a corporation developed for creating measures of intelligence and achievement in psychometiric consultation and research on intelligence. Dr. McGrew disagreed with Dr. Moore's report in so far as it suggested the ASVAB[11] was a good proxy of general intelligence for Sasser. The ASVAB is an aptitude test. Tests for adults which measure general intelligence are the WAIS, the WAIS-3, the WAIS-4, the Stanford-Binet-5, and the Woodcock-Johnson.

• Dr. McGrew criticized Dr. Moore's findings and observations in the following respects: When Dr. Moore suggested that the ASVAB is a "heavily loaded" measure of general intelligence, he violated joint test standards. Moreover, the Flynn effect is a real effect and should be adjusted for as a matter of common practice, especially in those situations where there is a specific cutoff score. In his report Dr. Moore incorrectly equated obsolete norms to other test variables such as demographic factors. Also Dr. Moore relied on an article published by Dr. Hagan in 2008 which suggested the Flynn effect should not result in an adjustment of score, however Dr. Hagan wrote a more recent article in 2010 wherein he stated the Flynn effect should be taken into consideration, but not to a specific score deduction.

---

[11] Armed Services Vocational Aptitude Battery

- Dr. McGrew further stated an adjustment should be made to Sasser's score to account for the Flynn effect and this is now the best practice. The best estimate would be to adjust three points per decade. Sasser's 1994 score would be 75, plus or minus the standard error of measurement. To account for the standard error of measurement, the score range would be 70 to 80. Accordingly, the best estimate on Sasser's WAIS-R score in 1994 would be a range of 73 to 78. The best test would be the one given in 2010, because it is closer in time to the norms.

## IV. Discussion

### A.  Expert Witnesses

As a threshold matter, the Court must determine if the witnesses presented as experts are qualified to testify in that capacity. Dr. Toomer, Dr. Moore, Dr. Smith, and Dr. McGrew were each submitted as expert witnesses, with no objections. Dr. Smith was proposed as a qualified expert in the history of special education in the state of Arkansas. Dr. McGrew was proposed as an expert in intelligence theory, psychometrics, and psychological and educational testing. Doctors Toomer and Moore rendered ultimate opinions as to whether or not Sasser is mentally retarded as defined by the applicable law.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. FED. R. EVID. 702. Under Rule

702, proposed expert testimony must satisfy three prerequisites to be admitted. *See Lauzon v. Senco Prods. Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).

First, evidence based on scientific, technical, or specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. *Id.* Second, the proposed witness must be qualified. *Id.* Third, the proposed evidence must be reliable or trustworthy in the evidentiary sense, so that if the finder of fact accepts it as true, it provides the assistance the finder of fact requires. *Id.* The district court has a "gatekeeping" obligation to make certain that all testimony admitted under Rule 702 satisfies these prerequisites. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597-98 (1993).

The Court finds that all the submitted testimony of the experts, with the exception of Dr. McGrew, should be admitted and considered as admissible expert testimony.

Dr. McGrew was presented as an expert on intelligence theory, psychometrics, and psychological and educational testing and was asked: to review Dr. Moore's interpretation of the ASVAB; to review Dr. Moore's and Dr. Toomer's treatment of the Flynn effect; to give an opinion on the application of the Flynn effect as a professionally accepted standard; to review the standard error of measurement as applied by Dr. Moore and Dr. Toomer; and to review the scoring issue on the vocabulary subtest of the WAIS-4, as

administered by Dr. Toomer.

Dr. McGrew testified that the ASVAB was a measure of aptitude, specifically created to measure aptitude for skills used in the military. He stated that Dr. Moore's characterization of the ASVAB -- as related to intelligence -- was incorrect and could mislead the reader in violation of joint test standards. Dr. McGrew also opined that the Flynn effect should be accepted scientific fact and should be adjusted for -- particularly in those situations where there is a specific cutoff score. Noting that Dr. Moore included the Flynn effect in other things which are considered in the norming stage of the test creation (such as demographic variables), Dr. McGrew concluded Dr. Moore's characterization to be misleading.

Dr. McGrew made no evaluation of Sasser as to whether he was mentally retarded or had an onset of mental retardation prior to age 18. Instead, he stated that his testimony was "criticism" and "to educate the Court." TR. 8, ECF No. 157. Thus, while Dr. McGrew's testimony could have had some bearing on the Court's evaluation of Dr. Moore's credibility and evaluation of his testimony, it was not helpful to the Court in determining whether Sasser was mentally retarded to an extent he would be granted relief from the death penalty. Accordingly, if Dr. McGrew's testimony met the first prong of the criteria mentioned above -- which is doubtful -- the Court found it to be unpersuasive and

outweighed by the testimony of Dr. Moore, which the Court found to be both credible and persuasive.

## B.  Mental Retardation

As noted above, the law applicable to this case requires four discrete prongs to be met, before a determination of "mental retardation" can be made.

First, Sasser must have significantly subaverage general intellectual functioning.

Second, the significantly subaverage general intellectual functioning must be accompanied by a significant deficit or impairment in adaptive functioning.[12]

Third, the significant deficit or impairment in adaptive functioning must manifest in the developmental period, but no later than age eighteen (18) years of age.

Fourth and finally, Sasser must also suffer from a deficit in adaptive behavior.

The Court will address each specific prong, as it relates to Sasser, in turn.


## 1.   Significantly  Subaverage  General  Intellectual Functioning

---

[12]   The Court notes the Arkansas Statute appears to only require a single deficit or impairment in adaptive functioning, however, Act 420 of 1993 refers to "deficits or impairments" in the plural. 1993 Ar. Legis Serv. 420 (West).

Significantly subaverage general intellectual functioning is a clinical term defined in the *Diagnostic and Statistical Manual of Mental Disorders* (4th ed., Text Revision)("DSM-IV") as "an IQ of about 70 or below (approximately 2 standard deviations below the mean)."  At the hearing, the experts also stated "significantly subaverage intellectual functioning" correlates with an IQ of 70 or below.

Sasser received two IQ scores which were presented to the Court, a score of 79 in 1994 and a score of approximately 83 in 2010.[13]  Those who testified in this case, Dr. Toomer, Dr. Moore, and even Dr. McGrew all agreed on one point – the 2010 examination is the best indication of Sasser's intellectual functioning.

Petitioner argues in his post-hearing brief, Br. ECF No. 159, that the 1994 exam is the best indicator because Arkansas law specifically demands reliance on intelligence measures performed closest to or contemporaneously with the time of the capital offense.  *Id.* at 14.  However, Sasser's expert at the evidentiary hearing, Dr. Toomer, testified that IQ is relatively stable over time.  Thus, despite when the tests were given, both could adequately establish Sasser's IQ because Sasser's IQ should remain somewhat constant throughout his adult life.

Moreover, *Atkins* itself, under which precedent Sasser brings

---

[13]  A separate IQ test was given to Sasser in 1994, but this was not considered by either Dr. Toomer or Dr. Moore due to issues in administration, and the proximity in time to the first 1994 examination.

this claim, holds the Eighth Amendment's prohibition of cruel and
unusual punishment prohibits the *execution* of person who is
mentally retarded, which means Sasser's current intellectual
functioning has been put at issue by counsel. (emphasis supplied)
*Atkins v. Virginia*, 536 U.S. 304 (2002).[14]   Thus, the Court will
discuss the most recent examination, and the one supported by the
experts at the hearing to be the most reliable indicator of
Sasser's intellectual functioning, first.

Respondent argues the score of 83 on the 2010 examination is
likely lower than Sasser's true score due to a scoring error on the

---

[14] The case cited by Sasser for the proposition that Arkansas law is
solely concerned with the status of the defendant at the time of the offense
is *Anderson v. State*, 163 S.W.3d 333 (Ark. 2004).  However, in that case the
Arkansas Supreme Court was faced with the specific issue of whether or not the
defendant was mentally retarded at the time of the offense, because unlike
Sasser, Anderson had raised the issue in the trial court and was then directly
appealing the death sentence.  *Id.*  The Arkansas Supreme Court stated that
"*Atkins* merely reaffirmed this State's preexisting prohibition against
executing the mentally retarded."  *Id.*  at 334-35.  Moreover, the evidence
rejected by the Arkansas Supreme Court was evidence of Anderson's IQ as scored
in 1996, while the crime took place in 2000.  *Id.*  The Court favored a 2001 IQ
score because it was closer in time to the offense, and appeared to be a
better indication of Anderson's mental abilities, stating "[s]ection 5-4-618
clearly provides that no defendant with mental retardation *at the time of
committing* capital murder shall be sentenced to death. The statute
specifically places the burden upon the defendant to prove mental retardation
*at the time of committing* the offense by a preponderance of the evidence."
*Id.*  at 356.  Clearly, in the context of Anderson's case, the issue was his
mental retardation at the time of the offense.  In fact, the Arkansas statute,
written before *Atkins* was decided, is written to address the issue of mental
retardation when presented at the trial court level.  However, there is no
indication in *Anderson* that the Arkansas Supreme Court would reject or
discount an IQ score rendered *after* the commission of a crime, as this
subsequent IQ score may be relevant, as here, to whether the defendant is
mentally retarded at the time of execution.  *Atkins* would prohibit the
execution of someone proven to have mental retardation, despite any evidence
of superior cognitive abilities at the time of the commission of the crime.
*See Atkins*, 536 U.S. 304.  Therefore, to suggest that the Arkansas Statute
only bars from execution those with mental retardation at the time of the
crime, but not those mentally retarded at the time of execution, could call
into question its validity, an issue not raised by the parties, and is too
broad of a reading of *Anderson*.

vocabulary subtest at question 23, which led to a one point reduction of score and a premature termination of the exam.  The implication by Respondent is that Sasser could have attained at least an 84 on the exam, if the exam had been properly scored, and possibly a higher score could have been achieved if Sasser had the opportunity to answer additional questions.

A determination of whether the true score should be 83 or 84 and even higher is unnecessary because if the Court assumes Sasser's score was correctly stated at an 83, applying the standard deviation of error, there is a 95 out of 100 percent chance that Sasser's IQ is in the range of 78 to 88.  At the very lowest estimation of the score, a 78, which is derived by accepting the examination as scored by Dr.  Toomer and application of the standard deviation of error to the lowest deviation, Sasser's score still remains eight points higher than two standard deviations from the mean, or a score of 70.  Therefore, such score does not meet the definition of "significantly subaverage general intellectual functioning."

Additionally, although the DSM-IV states it is "possible to diagnose Mental Retardation in individuals with IQs between 70 and 75," Sasser's 2010 score, even at its lowest projected level, still is above this range by three points.  APA, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 49 (4th ed.  Text Revision 2000).  Thus, the 2010 score provides no evidence Sasser's intellectual functioning

is "significantly subaverage."

The Court then turns to the IQ test administered in 1994.  On this examination, Sasser achieved a score of 79.  Sasser's contention is that due to the obsolescence of the norms for that test, the score should be discounted to a score of 75.  This is called the "Flynn effect"[15] and essentially is a way of accounting for an increasingly intelligent population.  Applying the standard margin of error to the score of 75 leaves the Court with a 95 out

_____

[15]  While much evidence was presented regarding the Flynn effect, the Court does not find it necessary to make a determination of whether or not the Flynn effect should be applied.  In this case, the decision to apply the Flynn effect is not a dispositive one, because even with the discounted score, Sasser still can not prove subaverage intellectual functioning by a preponderance of the evidence.  The Court does note the more recent cases appear to be taking into account the Flynn effect phenomenon, at least in the capital context.  See, e.g., *Thomas v. Allen*, 614 F. Supp.2d 1257 (N.D. Ala. 2009)(holding that '[a] court must consider the Flynn effect and the standard error of measurement in determining whether a petitioner's IQ score falls within a range containing scores that are less than 70"); *Walker v. True*, 399 F.3d 315, 322-23 (4th Cir. 2005)(vacating the district court's opinion which dismissed the habeas petition, and remanding for consideration of "relevant evidence, namely the Flynn effect evidence"); *Walton v. Johnson*, 440 F.3d 160 (4th Cir. 2006) (en banc); *In re Hicks*, 375 F.3d 1237, 1242 (11th Cir. 2004) (Birch, J., dissenting from the denial of a stay of execution because the IQ scores generated by a 1985 administration of the Wechsler Adult Intelligence Scale to the habeas petitioner were "likely to have been artificially inflated by what has been labeled 'The Flynn effect'"); *United States v. Davis*, 611 F.Supp.2d 472, 486-88 (D. Md. 2009) (district court considered Flynn effect in evaluation of defendant's intellectual functioning); *People v. Superior Court*, 28 Cal. Rptr.3d 529, 558-59 (Cal. Ct. App. 2005), overruled on other grounds by 40 Cal.4th 999, 56 Cal. Rptr.3d 851, 155 P.3d 259 (2007) (recognizing that Flynn effect must be considered); *State v. Burke*, No. 04AP-1234, 2005 WL 3557641, at *13 (Ohio Ct. App. Dec. 30, 2005) (stating that court must consider evidence on Flynn effect, but it is within court's discretion whether to include it as a factor in the IQ score).

There are also courts that do not recognize the Flynn effect. *See In re Mathis*, 483 F.3d 395, 398 n. 1 (5th Cir. 2007) (noting that circuit has not recognized Flynn effect as scientifically valid); *Berry v. Epps*, No. 1:04CV328-D-D, 2006 WL 2865064, at *35 (N.D. Miss. Oct. 5, 2006) (refusing to consider Flynn effect); *Bowling v. Commonwealth*, 163 S.W.3d 361, 374-75 (Ky. 2005) (noting that because Kentucky statute unambiguously sets IQ score of 70 as cutoff, courts cannot consider Flynn effect or standard error of measurement).

of 100 percent confidence Sasser's score on the 1994 test was in the range of 70 to 80.

For the Court to find that the 1994 examination is evidence of "significantly subaverage" intellectual functioning, it would have to assume not only that 1) the Flynn effect is appropriately applied to discount the score, but also 2) that Sasser should actually be considered in the lowest deviation possible for that score, a 70. Such an assumptions would take the Court to what is often called the "cut-off point" for finding subaverage intellectual functioning.

The evidence before the Court, as testified by the expert witnesses for the Petitioner and Respondent, is that Sasser's score is just as likely to be an 80 as it is to be a 70. In other words, the score has the same statistical probability to land at *any* point in the 70 to 80 range. Under a preponderance of the evidence standard, wherein Sasser must establish "the existence of a fact is more probable than its nonexistence," Sasser can not establish that it is more probable his IQ score is a 70 than it is any other score in the confidence range. *Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, n. 9 (1997).

As noted above and as Sasser mentions throughout his post-hearing brief, mental retardation "is possible" to be diagnosed in individuals with IQ scores in the range of 71 to 75, if those individuals also "exhibit significant deficits in adaptive

behavior." However, the Arkansas statute requires "significant subaverage intellectual functioning," which is a score of 70 or below, *and* it must be "accompanied by significant deficits or impairments in adaptive functioning." ARK. CODE ANN. 5-4-618.

A plain reading of the Arkansas statute sets forth the IQ score requirement and the adaptive functioning requirement as discrete prongs, both of which must be met in order to meet the "mental retardation" criteria. Utilizing a *combination* of an IQ score, which is higher than provided for in the statute, along with evidence of adaptive deficits appears to be a shift away from Arkansas' statutory scheme.

Earlier this year in *Miller v. State*, ___S.W.3d___, 2010 WL 129708 (Ark. 2010), the Arkansas Supreme Court rejected an argument that the Arkansas standard was unconstitutionally restrictive because *Atkins* recognized intelligence quotients of between 70 and 75 as mentally retarded. *Id.* The Court held such a contention "is entirely without merit" as *Atkins* left the states the ability to develop ways to enforce the restriction of execution of the mentally retarded. *Id.* The *Miller* court went on to find the evidence of an undetermined intelligence quotient, but an agreement the score was above a 65, and conflicting evidence as to adaptive behavior, supported a determination mental retardation was not proven by a preponderance of the evidence. *Id.*

Accordingly, Sasser has not proven he has "significantly

-47-

subaverage intellectual functioning" by a preponderance of the evidence, and does not meet the first prong of the Arkansas statute.  The only evidence before the Court to establish this prong is Sasser's 1994 IQ score, once the Flynn effect is applied to discount the score and a assumption is made that Sasser's actual ability is at the lowest point in the confidence interval range. However, the evidence also established it is no more likely that Sasser functions at the lowest end of the confidence range than it is likely he functions at the highest end of the confidence range.

## 2.  Significant Deficit or Impairment in Adaptive Functioning

Even if this Court were to conclude that Sasser had proven significantly subaverage intellectual functioning, Sasser has not proven significant deficits or impairments in adaptive functioning.

Adaptive behavior refers to the skills – conceptual, social, and practical, that are required for people to function in their everyday lives. *U.S. v. Davis*, 611 F. Supp.2d 472, 490 (D. Md. 2009).  In one sense, adaptive behavior addresses how persons apply their cognitive potential.  *Id.*  In considering adaptive functioning, one should consider actual performance, not knowledge or potential.

Adaptive functioning may be assessed by two different constructs-the classification in AAMR 2002 and the classification in DSM-IV-TR, which essentially measure the same skills.

The DSM-IV-TR classification of adaptive behavior addresses ten domains: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, and heath/safety. A diagnosis of mental retardation requires a significant limitation in at least two of the ten domains. *See* DSM-IV-TR at 41.

The AAMR classification divides adaptive behavior into three broader categories: conceptual, practical, and social. Diagnosis of mental retardation requires a significant limitation in one of the three categories. Conceptual skills include language, reading and writing, money concepts, and self-direction. Social skills include interpersonal skills, personal responsibility, self-esteem, gullibility, following rules, obeying laws, and avoiding victimization. The practical category includes the activities of daily living, including personal hygiene and grooming as well as home and financial management, occupational skills, and maintenance of a safe environment. *See* AAMR 2002 at 82.

Both Dr. Toomer and Dr. Moore agreed that while there are testing instruments developed to measure an individual's current adaptive functioning, no such instruments are developed to make a retrospective assessment of an individual's adaptive functioning. A retrospective assessment is required because the significant deficits in adaptive functioning, if any, must have their onset

prior to the age of 18.   ARK. CODE ANN.   § 5-4-618.   Sasser is currently forty-five years of age.[16]

The AAMR User's Guide specifically addresses how one should assess adaptive behavior when one is forced to conduct a retrospective diagnosis:

> In reference to the assessment of adaptive behavior: (a) use multiple informants and multiple contexts; (b) recognize that limitations in present functioning must be considered within the context of community environments typical of the individual's peers and culture; (c) be aware that many important social behavioral skills, such as gullibility and naivete, are not measured on current adaptive behavior scales; (d) use an adaptive behavior scale that assesses behaviors that are currently viewed as developmentally and socially relevant; (e) understand that adaptive behavior and problem behavior are independent constructs and not opposite poles of a continuum; and (f) realize that adaptive behavior refers to typical functioning and not to capacity or maximum functioning.

*User's Guide* at 20. The *User's Guide* goes on to advise clinicians to "recognize that self-ratings have a high risk of error in determining 'significant limitations in adaptive behavior,' " but that they can be used with caution in conjunction with multiple informants or respondents. *Id.* at 21. It also instructs evaluators not to rely upon past criminal or verbal behavior to make

---

[16] Additionally, it could also be relevant to know Sasser's adaptive functioning at the time of the crime, if such adaptive functioning would allow his then-scored IQ range of 70 to 80 to demonstrate mental retardation, as suggested by the DSM-IV. However, as stated above, this Court feels it was clear in *Miller v. State* that the state statute would not allow for such an interpretation, and because the statute requires "subaverage intellectual functioning," a score of 70 or below, *in addition* to any adaptive functioning deficits.

inferences about adaptive functioning or the presence of mental retardation. *Id.* at 22.

The AAMR 2002 manual states unequivocally that "[o]bservations, interviews, or other methods of assessment to gather information about adaptive behavior may complement, but ordinarily should not replace, standardized measures." AAMR 2002 at 84 (emphasis added).

Dr. Toomer found Sasser was "adaptively compromised in all three of the areas" noted in the AAMR. Pet'rs Ex. 1, Tab 1 at pg. 10. Dr. Toomer also testified that Sasser had eight areas of deficiency, apparently referencing the adaptive functioning definition of the DSM-IV. Tr. 66, ECF No. 157. Sasser's adaptive deficits were noted to include communication, social skills, community use, self direction, function academics, leisure and work in Dr. Toomer's report, and social interactions skills, language comprehension, language expression, time and punctuality, money and value, work skills, home and community orientation, and social interaction at the evidentiary hearing. Pet'rs Ex. 1, Tab 1; Tr. 66-67, ECF No. 157.

To retroactively assess Sasser's adaptive functioning, Dr. Toomer utilized an instrument called the Scales of Independent Behavior Revised ("SIB-R"). Dr. Toomer found this instrument was well suited for a retroactive assessment of Sasser's adaptive functioning, although such a purpose did not utilize the instrument

-51-

as intended, because the SIB-R took into account the various areas of adaptive functioning and was intended to be a qualitative measure.  Tr. 64-5, ECF No.  157.

Dr.  Moore took issue with Dr.  Toomer's use of the SIB-R, not necessarily as an instrument to retroactively assess adaptive functioning, but in the administration of the SIB-R, its scoring, and comparison to the norming standards.  Resp't Ex.  1, Tab 1. Dr.  Moore found the scores obtained on the SIB-R to be "invalid and unreliable."  *Id.*  at 17.

Specifically, Dr.  Moore took issue with the manner Dr. Toomer conducted the interviews and assimilated the information in the SIB-R.  Dr.  Toomer interviewed several individuals who knew Sasser in his developmental years and then combined the answers of these individuals and marked along the SIB-R where these responses fell.  Dr.  Moore opined that Dr.  Toomer did not give the individuals a single frame of reference for reporting Sasser's abilities.  In other words, one interviewee may have been recalling Sasser's abilities at age eight, and another at age twelve. However, all of these answers were combined to give a picture of Sasser's adaptive functioning.  Dr.  Moore further stated the best practice would be to interview each person individually and have them separately complete a SIB-R, then combine those individual scores.  Tr. 188, ECF No.  157.  Further, there should be a standard identification point for each individual who is

interviewed.    The result of Dr.    Toomer's adaptive functioning evaluation is a compilation of many people's recollections of Sasser's abilities over a wide range of ages. *Id.* at 190.

Dr.    Toomer relied upon interviews with the following individuals to make his assessment of Sasser's adaptive functioning:

- Theodore Blake - High School Coach and Teacher of Sasser

- Paul Breakfield - custodian at Lewisville High School

- Janice Washington Briggs - school classmate of Sasser

- Leroy Brown - Teacher and Principal of Lewisville Middle School

- Milton Castelman - Sasser's supervisor at Whistle Lumber Company

- Steve Jackson - Sasser's supervisor at Hudson Foods

- Elvie Jamerson - Classmate and fellow inmate with Sasser

- Robert Purifoy - Sasser's supervisor at Hudson Foods

- Dorthy Smith - Sasser's teacher

- Pinkie Strayhan - Sasser's teacher

- Robert Strayhan - Sasser's middle school football coach

- Lecia Tallent - Sasser's high school teacher

- Margie Kemp - Sasser's sister

- Arthur Sasser - Sasser's brother

- Frank Sasser - Sasser's brother

- Gloria Sasser - Sasser's mother[17]

- HB Sasser - Sasser's brother

Mr. Blake described Sasser in his affidavit, Pet'rs Ex 1, Tab 28, as a "mentally slow" individual who was in special education in high school, specifically what was known as Group III and served the lowest-functioning students. Mr. Blake also remembered Sasser as staring blankly when spoken to, and as not able to understand a joke because Sasser would only laugh when others did so. Sasser was not able to grasp football plays and attempting to explain them to him was a "waste of time" so fundamentals of the game had to be explained to him repeatedly. Sasser kept to himself, was at times made fun of, and never seemed age-appropriate.

Paul Breakfield is eight years older than Sasser and knew Sasser's family well and also saw Andrew everyday at school when he was the custodian. *Id.* at Tab 29. Breakfield reports Sasser was well behaved and respectful, but did not have athletic ability.

Janice Briggs was an elementary, middle, and high school classmate of Sasser. *Id.* at Tab 30. She saw him everyday as their siblings were friends, they rode the bus together, and the families knew each other well. She describes Sasser as a "loner" who would laugh longer than everyone else in an inappropriate

---

[17]   Apparently Dr. Toomer did not use the responses by Ms. Sasser, as he found she minimized Sasser's dysfunction. Tr. 119-20, ECF No. 157.

manner.

Sasser was friends with Willie Carroll who was Brigg's second cousin.  Sasser and Carroll were seen as "class nerds" and did not know if they were "coming or going."  *Id.*  Willie was in Group I, with the brightest students, and was Valedictorian of the class. Sasser was in Group III, with the lowest level students.[18]  Brigg remembered that Sasser did not have a girlfriend, and was the class clown.

Brigg also remembered that Sasser walked in graduation with the rest of the class.  However, special education students would receive a certificate of attendance rather than a diploma.  After high school, Brigg knew Sasser had a job at a lumber mill and found a girlfriend.

Leroy Brown taught Sasser math and was the assistant principal and then principal of the Lewisville Middle School during Sasser's school years.  *Id.*  at Tab 31.  Brown stated that Sasser was mischievous, and for example, he and other boys would take lunch trays outside and eat the food from the trays.  Sasser would "clown around" but take things too far and get in trouble.  Sasser was not a good student, but took classes designated on his transcript with a "P" or "Pr," which signaled a "practical" class which taught

---

[18]   It should be noted that Willie Carroll testified at the Rule 37 hearing, Pet'rs Ex.  1, Tab.  16, 88, and stated he and Sasser were friends throughout their school years.  Carroll also indicated he and Sasser were in the same group - Group II.  Mr.  Carroll reiterated this in his interview with Dr.  Moore.  Resp't Ex.  1, Tab 3, 139-143.

basic skills at the student's own pace.

The school practice was to promote failing students, even though Sasser earned C's in his lower level classes. Sasser was considered a Group III student because he did poorly on tests and could not do well even after extra time and assistance was provided. Sasser received a certificate of attendance because he was in special education classes. The information Mr. Brown gave to Dr. Moore in his interview is consistent with that in Mr. Brown's affidavit.

Milton Castleman was a Mill foreman with Whistle Lumber company when Sasser was employed there. Pet'rs Ex. 1, tab 32; Pet. Ex. 1, Tab 16, 12-24. Sasser was arrested on his capital charges while employed at Whistle Lumber. Sasser was a good worker who showed up on time and had no disciplinary actions. Sasser was a stacker, he was told which grade of lumber to pull and stack. He did not have to make any decisions and had the most basic laborer position. It would take judgment and skill to grade the lumber, and Sasser did not have such judgment or skill, although some individuals working as stackers were able to judge unmarked lumber. Sasser was only able to stack the boards when marked by the Grader, who is the person responsible for marking the boards appropriately to be stacked in the correct bundle.[19]

---

[19] Dr. Toomer indicates that Mr. Castleman stated Sasser had to have boards specially designated for him in order to be a stacker because Sasser was incapable of determining wood grade. Pet'rs Ex. 1, Tab 1, 16. However, Mr. Castleman did not indicate in his declaration that Sasser had any

Steve Jackson was a supervisor at Hudson foods when Sasser was employed there. Pet'rs Ex. 1, Tab 33. Sasser was a stacker which means he would stack packed boxes on a wood pallet. The boxes would be color coded as to the grade of chicken and Sasser's job was to place twenty-five boxes of each specific grade on to each wood pallet. Mr. Jackson stated that Sasser had difficulty completing the task and had to be monitored quite carefully because he would place the incorrect box on an incorrect pallet and slow production.

Due to the constant incorrect placement of the boxes on the pallets, Sasser was moved to an icer position. The machine was pre-set to the amount of ice to be dispensed, and Sasser simply had to push a button in order to complete his job. Sasser was not fired because the help was needed at the time.

Elvie Jamerson grew up around Sasser and Sasser's family. Pet'rs Ex. 1, Tab 34. Additionally, he served time with Sasser in 1986 and in 1990-2001.[20]  Jamerson remembered Sasser from school,

---

"difficulty" as noted by Dr. Toomer. Mr. Castleman stated that one person was designated as a grader, and that person would grade and mark the lumber according to the quality of each piece. As a stacker, Sasser would pull the correct grade of lumber to stack. Mr. Castleman indicated the grader would grade and mark all lumber, not just that which Sasser was to stack. From the declaration it appears Sasser was quite capable as a stacker, but would not be able to move up to the position of a grader, because he would be unable to grade wood on his own judgment. This is quite distinct from the notion posited by Dr. Toomer that Sasser required special assistance in his job at Whistle Lumber Company.

[20] It was noted at the hearing that Mr. Jamerson's dates of when he was incarcerated with Sasser do not correlate to the actual dates Sasser was incarcerated, because Sasser was not incarcerated until 1989. TR at 122-23.

and was a year older than Sasser's brother, H.B.  Jamerson stated at school it was always known that "something was wrong" with Sasser.  *Id.*  He believed Sasser "has never been right in the head" due to Sasser's behavior.  *Id.*  Sasser would make comments to himself and then laugh too long or he would mutter where no one could understand, but still laugh to himself.  Sasser was slow.  Sasser would bale hay with Jamerson and Sasser was good at this job.

Sasser also did things which "made no sense at all" to Mr. Jamerson, including when Sasser stated he was in the Army, but in fact was living out of an old car.  *Id.*[21]

Sasser, when incarcerated with Jamerson, would make up stories of girls he had dated and asked Jamerson to draw on envelopes Sasser sent out.  Jamerson indicated he was housed with Sasser again when Sasser was charged with a parole violation due to the capital charges against him.[22]

Robert Purifoy was a supervisor at Hudson Foods when Sasser worked there.  Pet'rs Ex. 1, Tab 35.  Sasser was strong, but slow.  Sasser was removed from packing because he would place graded

---

[21]  Some evidence indicated Sasser lived in a car in the woods, perhaps just in the day time, while other evidence is that Sasser lived in an abandoned house near his mother and H.B.'s homes, at least at night.  The record is unclear on the specific location of where Sasser lived while continuing the ruse of being at Army boot camp.

[22]  The records from the Arkansas Department of Correction do not show Sasser was housed in the ADC after his release from his rape conviction until Sasser was convicted of murder and sent to death row.

chickens into an incorrect box. Sasser would only follow directions for ten to fifteen minutes. Sasser was eventually moved from stacking to the ice machine.

Dorothy Smith was Sasser's teacher for Home Economics, Adult Family Living, and Consumer Education. Pet'rs Ex. 1, Tab 36. Ms. Smith also knew Sasser's family for many years.

Sasser passed the lab portion of Home Economics because other group members would cover for him. Smith did not think Sasser was mentally disabled, but she did find him slow. Sasser received a D in Adult Living and an F in consumer education. Smith also recounted the same information regarding special classes as other affiants had.

Ms. Pinkie Strayhan was a librarian when Sasser was a student. Pet'rs Ex. 1, Tab 37. She remembered that Sasser would come into the library with friends and giggle or laugh, rather than study. Strayhan had to discipline Sasser for his actions. Additionally, Sasser always seemed immature.

Mr. Robert Strayhan was also a teacher and coach of Sasser's. Pet'rs Ex. 1, Tab 38. Sasser, like many other players, had trouble learning the football plays. Sasser had correct manners and was respectful.

Ms. Lecia Tallent was another teacher of Sasser's in High School. Pet'rs Ex. 1, Tab 39. Sasser was in Group III, the lowest level learners, and he used a curriculum, books, and

examinations which had been modified similar to how Special Education modifies these items for students today.  Sasser was awarded a Certificate of Attendance and was a Title I student.

Dr. Moore also interviewed those who knew Sasser in order to gauge Sasser's adaptive functioning and behavior.  The notes from the interviews with H.B. Sasser and John Cartwright are consistent with the testimony at the evidentiary hearing and will not be summarized here.

Dr. Moore also interviewed Sasser's mother, Gloria Sasser, who recounted Sasser as someone who helped her with chores, would read books on mechanics and the encyclopedia, and was proficient at ironing his clothes.  She indicated he could cook, wash his own clothes, and wash dishes.  Resp't. Ex. 1, Tab 3, 94.

Archie Sasser, Sasser's brother, was also interviewed by Dr. Moore.  Resp't. Ex. 1, Tab 3, 98.  He stated that Andrew lived with him and their sister Margie at times, but did not pay rent as he would stay for a few days up to a week at a time, "crashing" on the couch.  During these times Margie would do some cooking, but generally it was "fend for yourself."  Archie also recalled Sasser being a good driver, with some accidents before Sasser went to jail, with alcohol likely being involved in the accidents.

Dr. Moore also interviewed someone who appears to be "Robert Reeves" but the notes from this interview are difficult to read.  Resp't Ex. 1, Tab 3, 102.  The same is true for an individual who

appears to be "Milton Castelman," who stated that Sasser never complained about the jobs he was doing; that he was fine at his job; that he was at work on time; that he did not skip days; and that he got along well with co-workers. Resp't. Ex. 1, Tab 3, 103.

Janet Thomas was also interviewed by Dr. Moore, she was Sasser's girlfriend at the time he was incarcerated and is the mother of his child. Resp't Ex. 1, Tab 1, 105. She stated Sasser would write to her when he was incarcerated. Additionally, when he would take her out, he always saw that she got home safely, was a good driver, and checked on her welfare. Sasser always looked appropriately dressed to the situation and maintained proper hygiene. In their relationship they spoke about the future, including buying her a promise ring.

Frank Sasser, a brother to Sasser, was also interviewed and stated he moved out when Sasser was ten or eleven, so his knowledge of this time is limited. Resp't Ex. 1, Tab 3, 110. However, he felt others regarded Sasser as a good worker. Frank remembered Sasser being "slow" but thought he was "normal." For hobbies, Sasser could install car stereos, with a result of a good sound with hidden wires. Frank stated Sasser had pretty good common sense.

Dr. Moore also interviewed Jerry Whistle who stated Sasser was a good employee, on time, polite, and did his job. Resp't Ex.

1, Tab 3, 111-12.  Sasser "seemed intelligent enough." *Id.* at 112.

Margie Sasser stated she remembered Sasser working on cars, hers specifically, which sometimes made it worse than before. Resp't Ex. 1, Tab 3, 113.  One time a friend had to help put it back together correctly.  When she lived with Sasser and Archie, Sasser would sometimes help with bills and sometimes not.  Sasser was not responsible with money.  She would cook for her brothers at this time.  During the time when Sasser was living in the woods with the ruse of being in the Army, Margie stated he seemed different in attitude, perhaps depressed, and began "letting himself go" by wearing clothes several days in a row.

Dr. Moore, like Dr. Toomer, also interviewed Dorothy Smith, and to the extent his notes are legible, the interview appears consistent with that reported by Dr. Toomer and summarized above. Resp't Ex. 1, Tab 3, 116.

Mr. Gayther Crank and Ms. Jana Crank were interviewed by Dr. Moore, and Mr. Crank described when Sasser, like Sasser's brothers and sisters, would work on his farm.  Resp't Ex. 1, Tab 3, 121. Crank described Sasser as capable with farm tasks, but "lazy" and "not dependable" to show up for work.  However, when he would show up, "you could depend on him to do the job" and Sasser would drive the tractor and disc the fields.  *Id.*  Sasser "could do lots of stuff but it was getting him to do it," and he "would work twice as hard not to do something." *Id.* at 122.

Sasser would work on lawnmowers and other equipment for Crank. Sasser was described as having a dull nature, and not someone you could joke with like other members of Sasser's family.

Ms. Crank taught high school English and Art and "very definitely" did not believe Sasser was mentally retarded. *Id.* at 123. The Cranks had employed mentally retarded individuals to work for them, and Sasser clearly did not have the same issues.

Dr. Moore also interviewed Whitney, whose last name appears to be Whitelaw. Resp't Ex. 1, Tab 3, 125. Whitelaw did not remember Sasser, but did give some information about the way classes were structured when Sasser was in high school. Whitelaw stated the "basic" "practical" courses are not special education classes. The use of "practical" on Sasser's transcript meant to her that he was not in special education.

Dr. Moore, like Dr. Toomer, also interviewed Ms. Pinkie Strayhan, and to the extent the interview notes are legible, they appear to be consistent with the interview reported by Dr. Toomer. Resp. Ex. 1, Tab 3, 127.

Dr. Moore, like Dr. Toomer, also interviewed Ms. Lecia Tallent, who stated she was the only special education teacher when Sasser was in school, and he was not one of her students. Resp. Ex. 1, Tab 3, 130. She stated she would specifically remember a student because she would teach the special education students for four years. Her interview, to the extent it is legible, is similar

to that given to Dr. Toomer.

Kenneth Lindsay was interviewed by Dr. Moore. Resp. Ex. 1, Tab 3, 133. Lindsay was principal of Lewisville schools in around 1986. Lindsay stated that he was not sure if Sasser was in special education classes, but he thought he was. Lindsay indicated Lecia Tallent would be the one who would know that information.

Dr. Moore interviewed Dr. Mariann Seider, but the majority of those notes are illegible. Resp't Ex. 1, Tab 3, 137.

Willie Carrol, a life-long friend of Sasser's, was interviewed by Dr. Moore. Resp't Ex.1, Tab 3, 139. Carrol stated that mentally retarded kids rode a special bus and had special classes, and that Sasser did not ride with or attend those classes. Carrol was just friends with Sasser, and they did not do much together outside of school because neither had a car. However, Carrol "never noticed" anything to indicate Sasser's IQ, based upon their general conversations as friends. *Id.* at 140.

Sasser was like the "class clown," cracking jokes, and making comments about girls. Sasser dated a few girls that Carrol could remember.

After high school, Sasser and Carrol went down different paths. Carrol went to college and held two jobs. He did visit Sasser after Sasser's first arrest, but after that they only saw each other in passing.

Dr. Blackburn was also interviewed by Dr. Moore. Resp't Ex.

1, Tab 3, 144.  Dr.  Blackburn conducted the 1994 IQ testing on
Sasser.  Mostly, this interview is illegible.  However, Dr.
Blackburn recorded his perceptions of Sasser in a report prepared
for Sasser's state court trial.  Resp't Ex.  1, Tab 6, 224.  Dr.
Blackburn noted in his report, which was made contemporaneous with
the testing of Sasser in 1994, that Sasser had "dull normal"
reading abilities, but his functioning was "certainly not at a
'mentally retarded level.'"  *Id.*  at 227.  Moreover, general
information and vocabulary skills are "somewhat below average adult
level" but "certainly are not consistent with any degree of 'mental
retardation.'"  *Id.*

Dr.  Moore interviewed Maxine Cornelius, who started teaching
in 1982 or 1983.  Resp't Ex.  1, Tab 3, 148.  She did not remember
Sasser at all.  She did state basic English used the same book as
regular English classes, but went at a slower pace.

Dr.  Moore also interviewed Martin Herman.  Resp't Ex.  1, Tab
3, 153.  Herman was a football coach at Lewisville schools and
remembered Sasser.  He stated Sasser was a loner who was just by
himself all the time.

Mike Deal was interviewed by Dr.  Moore.  Resp't Ex.  1, Tab
3, 155.  Deal became the high school principal in Lewisville in
1982.  He remembered Sasser as a quiet kid who never bothered
anybody.

Via telephone, Dr.  Moore interviewed Pamela Galloway, whose

husband coached football, and she was a teacher in Lewisville. Resp't Ex. 1, Tab 3, 167. She remembered Sasser and did not know of anything negative about him. She did not remember having Sasser in her classes and she taught Math and Science classes. Practical math was for those not college bound, and perhaps with learning disabilities. It was not for mentally retarded students.

Vivian Morlar was also interviewed by Dr. Moore via telephone. Resp't Ex. 1, Tab 3, 169. She remembered Sasser as a "good" guy from a poor family, who was never any trouble. She stated Sasser's transcript should reflect if he was "special education" or "resource" status in high school. The "practical" classes or "pr" classes were lower level, but not resource or special education.

Karl Sensley was a friend of Sasser's who was also interviewed via telephone by Dr. Moore. Resp't Ex. 1, Tab 3, 171. Sensley stated he knew Sasser in elementary and middle school, but about ninth or tenth grade they began to take different classes and were not around each other as much. In school Sasser was placed with the slow readers in group "c" in about sixth or seventh grade. Sasser would get distracted and fall behind, and he wanted to talk and be disruptive. Sensley did not see Sasser after graduation. However, socially Sensley remembered Sasser to be "just like the rest of us – just high school country kids." *Id.* at 172. Sensley also characterized Sasser as having the potential but being lazy,

Sasser "just did not want to do it . .   Not pushed to do his homework." *Id.*  Sasser also indicated to Sensely that he had no one at home pushing him to complete school work, had no curfew set, and did what he pleased.  *Id.* at 173.

Sensely also stated Sasser was "pretty artistic" and recalled a particular paper meche project Sasser created.  Id.  at 174.  Sensely also stated it was not uncommon for those not going to college to remain living at home for a few years.

The Court agrees with Dr. Moore regarding the manner in which the SIB-R was completed by Dr.  Toomer.  The convergence of data across a wide range of ages combined with the lack of specificity in the interviews to the items noted in the SIB-R renders the instrument somewhat unreliable.  For example, the SIB-R under the "Social Interaction" sub heading asks how well the subject "[w]aits at least 2 minutes for turn in a group activity".  Pet'rs Ex.  1, Tab 3,6, question 7.  Dr.  Toomer clearly marked "does, but not well-or about 1/4 of the time-may need to be asked." *Id.*  However, there is no reflection of enough data in the interviews, provided by Dr.  Toomer as the raw data underlying his report, to support this conclusion.

Many of those interviewed remembered Sasser as "dull" and at times immature and inappropriate to the situation at hand, such as laughing longer than others, not laughing until others did, or laughing to himself.  Sasser was not a high-achieving student, but

it is unclear if he was simply placed in slower-paced classes, or if he was considered a "resource" or "special education" student. The only clear indication is his transcript, which reflects he was placed in several "practical" classes.  The majority of those interviewed appeared to regard practical classes as slower and modified from the regular curriculum, but not resource or special education level.

Many of those interviewed described Sasser as having potential, but not much motivation.  While Sasser did not graduate from high school, his transcript, the interview with "senior sponsor" Ms. Strayhan and interviews with his family members reflect that all assumed Sasser was on track to graduate.  He came back to school his senior year taking courses that would lead to a diploma.  Moreover, his family first learned of his failure to earn a diploma during the criminal trial and the family was "surprised" by the information.

From his work history, it is clear Sasser struggled with job duties which involved labeling and grouping, such as the chickens at Hudson Foods.  However, Sasser was able to come to work on time, get along with co-workers, and not abuse absences.  The job history also reflects that once a job was given to him within his abilities, he was able to perform the job reliably well.

Sasser also was able to live on his own for a period of time. During this time Sasser was pretending to be at Army boot camp, but

he was actually living on his own in an abandoned car and an abandoned home. Sasser was able to provide for himself, although to do so he had to take food from his brother's house. However, Sasser managed to take the food at times no one was home to continue the ruse. Moreover, he placed calls to keep up the charade that he was in boot camp by phoning his family to tell them about Army life. The Court also notes Sasser did not end the charade on his own, but was spotted by others and confronted by family members. It is unclear how long Sasser would have managed to live on his own.

Sasser also managed to maintain relationships outside of the family with friends and with girlfriends. While some people remembered Sasser as socially awkward, he also was remembered as being a regular kid of his age. In fact, no person who knew Sasser in the developmental period, even those trained in special education, regarded Sasser as mentally retarded. He was described as "slow" by some, which would be consistent with the low-average intelligence scores noted in the previous section.

The opinions of those interviewed can not be substituted for expert opinion on the subject of mental retardation. However, the data underling the reports is simply inconclusive to show Sasser suffered significant deficits in adaptive behavior to the extent reported by Dr. Toomer. There is simply not enough consistent information in the data to make any sort of reliable conclusion

-69-

about the defendant's actual performance of adaptive behaviors. The characterization by Dr. Moore appears most consistent with the underlying data and suggests Sasser had limitations, but no significant deficits in adaptive functioning. At the very least, Sasser has not shown significant adaptive deficits by a preponderance of the evidence.

Due to the forgoing analysis of the first two prongs of the statute, the Court does not find reason to consider the last two prongs.

### V.   CONCLUSION

For the forgoing reasons, the Court concludes -- after conducting an evidentiary hearing on Sasser's mental retardation claim -- that he is not mentally retarded as that condition is defined in *Atkins v. Virginia, 536 U.S. 304 (2002)* and that Sasser's Amended Petition for Writ of Habeas Corpus, ECF No. 48, should be, and hereby is, **DENIED.**

**IT IS SO ORDERED this** 3rd day of November, 2010.

/S/ Jimm Larry Hendren
JIMM LARRY HENDREN
CHIEF UNITED STATES DISTRICT JUDGE