UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

ANDREW SASSER                                                    PETITIONER

v.                              No. 4:00-CV-04036

WENDY KELLEY, Director,
Arkansas Department of Correction                                RESPONDENT

## MEMORANDUM OPINION

On March 20, 2014, the United States Court of Appeals for the Eighth Circuit issued a
mandate (Doc. 180) in this case affirming in part and reversing in part this Court's previous
judgments, and remanding the matter for proceedings consistent with the Eighth Circuit's opinion.

## I.     Background

On May 4, 1994, Petitioner Andrew Sasser was convicted of capital murder and sentenced
to death for the July 12, 1993 homicide of Jo Ann Kennedy. *See Sasser v. State*, 902 S.W.2d 773
(Ark. 1995). The murder occurred while Kennedy worked as a clerk at an E-Z Mart convenience
store in Garland City, Arkansas. *Id*. at 774–75. Following a direct appeal, and Sasser's effort to
obtain Arkansas state court postconviction relief pursuant to Arkansas Rule of Criminal Procedure
37, Sasser sought federal relief through a writ of habeas corpus. (Doc. 3). The Court dismissed
the petition but granted a certificate of appealability with respect to several issues. (Docs. 30 and
34). During Sasser's first appeal to the Eighth Circuit, and following the Supreme Court's decision
in *Atkins v. Virginia*,[1] the Eighth Circuit remanded for a determination of whether Sasser was
ineligible for the death penalty because of intellectual disability, but retained jurisdiction over the

---

[1] *Atkins v. Virginia*, 536 U.S. 304 (2002), holds that execution of intellectually disabled
persons is prohibited by the Eighth Amendment to the Constitution.

bulk of Sasser's case. After reviewing the *Atkins* issue twice, the Eighth Circuit issued its opinion and mandate remanding to this Court[2] and giving rise to these proceedings. The Eighth Circuit affirmed dismissal of many of Sasser's claims, but reversed with respect to Sasser's *Atkins* claim and four of his claims of ineffective assistance of counsel at the sentencing phase of Sasser's trial. The Eighth Circuit vacated the Court's denial of relief on those four claims and the Court's finding that Sasser is not intellectually disabled under *Atkins*.

The four claims to be considered on remand are that Sasser's trial counsel was unconstitutionally ineffective when he failed to: "1. Prepare for the sentencing phase of the trial; 2. Obtain a timely psychological evaluation of Sasser; 3. Meaningfully consult with a mental health professional; and 4. Object when the prosecutor misconstrued the mitigating evidence that the defense had presented concerning Sasser's mental impairment and lessened culpability or to rebut the argument." *Sasser v. Hobbs* (*Sasser II*), 735 F.3d 833, 851 (8th Cir. 2013) (brackets and quotation omitted). The Eighth Circuit directed the Court to conduct a hearing on the four ineffective assistance of counsel claims to determine whether they are procedurally defaulted claims, and if so, whether they should be excused. *Id.* at 853, 855; *see also Sasser v. Hobbs*, 743 F.3d 1151, 1151 (8th Cir. 2014) (denying rehearing) ("It should be clear the district court, on remand, must consider whether Andrew Sasser's state postconviction counsel failed to raise the four potentially meritorious ineffectiveness claims." (quotation and brackets omitted)). The Eighth Circuit also directed the Court to make a new *Atkins* finding using the appropriate standard. *Sasser II*, 735 F.3d at 855. The Court's *Atkins* finding is addressed by a separate opinion.

---

[2] This case was initially assigned to Hon. Harry F. Barnes. On November 13, 2009 the case was reassigned to Hon. Jimm Larry Hendren. On March 25, 2014, following the most recent remand, the case was reassigned to the undersigned.

A hearing was set, and the Court's scheduling order directed the parties that the Court was to hear evidence regarding Sasser's four surviving ineffective assistance claims. (Doc. 217). The Court also directed the parties to submit prehearing briefs with proposed findings of fact and conclusions of law. In February 2016, the Court held a four-day hearing and heard testimony from the following individuals in the following order: Charles Potter ("trial counsel"), Jacquelyn Carter, Rupert Purifoy, Steve Jackson, Leroy Brown, Deborah Sallings ("postconviction counsel"), Joseph Cummings, Dr. Ann Thomas, Dana Harrison, Mark Bezy, Betty Perry, Margie Sasser Kemp, Artha Sasser, H.B. Sasser, James Blackburn, Ph.D., Pamela Blake, M.D., Dale Watson, Ph.D., Leslie Lebowitz, Ph.D., and Richard Burr. Following the hearing, the Court invited posthearing briefing.

## II.     Applicable Law

A federal court may consider a petition for writ of habeas corpus from a person serving a state court sentence that violates the Constitution or a federal law or treaty. 28 U.S.C. § 2254(a). A state court sentence may violate the Sixth Amendment to the Constitution if the petitioner was deprived of the right to effective assistance of counsel at trial and sentencing, which occurs when counsel's performance is deficient ("counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment") and the performance prejudiced the defense ("counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable"). *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Before a federal court may grant a petition, the petitioner must first have exhausted state court remedies, "unless the state remedies are ineffectual or non-existent." *Sasser II*, 735 F.3d 833, 842 (citing 28 U.S.C. § 2254(b)(1)). The exhaustion requirement protects a state court's interest in correcting its own constitutional violations, and is grounded in principles of comity. *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). Where state court remedies have been exhausted, a federal

court cannot grant a petition for a writ of habeas corpus unless the state's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or … was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

Where a claim has not been exhausted, that new claim must be presented and exhausted in state court proceedings before a federal court can grant a petition.  *Rhines v. Weber*, 544 U.S. 269, 274 (2005).  Dismissal of the entire petition without prejudice is generally required in such instances.  In limited circumstances where there has been good cause for a petitioner's failure to exhaust a claim in state court, a federal court may stay its proceedings and hold the matter in abeyance until the new claim is exhausted, or allow the petitioner to amend his petition and omit the new claim.  *Id.* at 277, 278.

Where a claim has been raised but defaulted during state proceedings due to the petitioner's failure to abide by a state's procedural requirements, although it is technically exhausted (because a state remedy is no longer available to the petitioner), the same need for comity exists that undergirds the exhaustion requirement.  *Coleman*, 501 U.S. at 732.  When there has been a procedural default, there is typically an independent and adequate state ground barring federal habeas relief, unless a petitioner can show cause to excuse the default and prejudice to himself if the default is not excused.  *See id.* at 745–47.

As a general rule, the ineffective assistance of counsel in the state postconviction proceedings does not provide cause to excuse a procedural default.  *Id.* at 753–54.  A narrow exception to this rule exists.  Ineffective assistance of counsel during postconviction proceedings may provide cause to excuse procedural default

> where (1) the claim of ineffective assistance of trial counsel was a substantial claim;
> (2) the cause consisted of there being no counsel or only ineffective counsel during

the state collateral review proceeding; (3) the state collateral review proceeding was the initial review proceeding in respect to the ineffective-assistance-of-trial-counsel claim; and (4) state law requires that an ineffective assistance of trial claim be raised in an initial-review collateral proceeding.

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (citing *Martinez v. Ryan*, 566 U.S. 1, 14, 17–18 (2012)) (quotations and punctuation omitted).  Because there is no meaningful distinction between a state that denies permission to raise ineffective assistance claims on direct appeal and one that, "as a matter of procedural design and systemic operation," technically allows but effectively denies a meaningful opportunity to raise ineffective assistance claims on direct appeal, the Supreme Court has expanded the narrow exception to cover states in the second category.  *Id.*, at 429.  In this case, Arkansas falls into the latter category.  *Sasser II*, 735 F.3d at 853 ("For these reasons, we conclude Arkansas did not 'as a systematic matter' afford Sasser 'meaningful review of a claim of ineffective assistance of trial counsel' on direct appeal." (citation omitted)).

The four ineffective assistance claims before this Court on remand may provide grounds for habeas relief if (1) they were exhausted in state court, and the state court's decision was contrary to or unreasonably applied clearly established federal law, or was based on an unreasonable determination of the facts based on the evidence in the state court proceeding; or (2) they were procedurally defaulted in state court proceedings, but the default was due to postconviction counsel's ineffective assistance and that ineffective assistance would prejudice the petitioner.

## III.    Analysis

As an initial matter, the Court will address Sasser's fourth claim identified by the Eighth Circuit—that trial counsel was unconstitutionally ineffective when he failed to object when the prosecutor misconstrued the mitigating evidence that the defense had presented concerning Sasser's mental impairment and lessened culpability or to rebut the argument.  Sasser has presented

no argument or evidence concerning this claim. Because "[t]he law favors an adversarial presentation of issues in order to conserve judicial resources and to ensure that cases are resolved in the context of an actual dispute," Sasser's failure to present argument or evidence concerning this claim results in abandonment. *Malone v. Vasquez*, 138 F.3d 711, 716 (8th Cir. 1998). This leaves only three claims that must be analyzed—Sasser's claims that his trial counsel was unconstitutionally ineffective when he failed to: (1) prepare for the sentencing phase of the trial; (2) obtain a timely psychological evaluation of Sasser; and (3) meaningfully consult with a mental health professional. *Sasser II*, 735 F.3d at 851.

### A.     Claim Comparison

The first issue the Court must resolve is whether these three claims are claims that Sasser exhausted before the state court, or if they are new or procedurally defaulted claims and susceptible to a *Martinez/Trevino* analysis. Claims are the same when they have the same factual and legal premises, and are new when new factual allegations fundamentally alter the legal claim already considered. *See Vasquez v. Hillery*, 474 U.S. 254, 260 (1986) (holding supplemental evidence did not fundamentally alter legal claim).

The Court is cognizant that a determination that a claim is new might in a similar case require the Court to follow the stay and abeyance process identified in *Rhines*. *See Sasser v. Hobbs*, 745 F.3d 896, 899 (8th Cir. 2014) (Colloton, J., dissenting from denial of rehearing en banc).

> However, if no state court remedy is available for the unexhausted claim–that is, if resort to the state courts would be futile–then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim unless the petitioner can demonstrate cause and prejudice for the default' (or actual innocence, which is not an issue in this case).

*Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996). That is, if there is no state remedy, new claims are treated as procedurally defaulted. To the extent any of these three ineffective assistance claims is new, Arkansas has no available state court remedy to exhaust the claim. *See, e.g.*, *Ward v. State*, 455 S.W.3d 830, 832, 835 (Ark. 2015) ("This court will recall a mandate and reopen a case only in extraordinary circumstances." … "As we have held, recalling the mandate is an extremely narrow remedy reserved for unique situations; to enlarge it to allow typical claims of ineffective assistance of counsel would alter the nature of the relief entirely.") Therefore, any claim that is new, or any claim that was otherwise procedurally defaulted, may be excused under *Martinez* and *Trevino* and the matter need not be stayed pending exhaustion in state proceedings.

Determining whether any of Sasser's three ineffective assistance claims was exhausted or procedurally defaulted requires the Court to compare those claims to the claims Sasser made in the state court proceedings. This analysis is complicated by the parties' competing arguments that the other party is judicially estopped from asserting the position now taken with respect to whether these claims were exhausted or procedurally defaulted. Judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)). It is employed to protect the integrity of the judicial process. *Stallings v. Hussman Corp.*, 447 F.3d 1041, 1047 (8th Cir. 2006). The Court will address the judicial estoppel arguments first.

### 1.     Judicial Estoppel

A nonexhaustive list of three factors should inform the Court's determination of whether judicial estoppel should apply in a given instance:

First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.* (quoting *New Hampshire*, 532 U.S. at 750–51).

The Respondent argues that Sasser asserted a prior inconsistent position at the inception of this habeas matter which should prevent the consideration of the ineffective assistance of counsel claims under *Martinez* and *Trevino*. Specifically, the Respondent states that Sasser previously asserted that the ineffective assistance claims pleaded in the amended habeas petition were presented and adjudicated in state court in his Rule 37 proceeding, and therefore, properly preserved for federal review. The Respondent concludes that Sasser should now be estopped from arguing that the claims were procedurally defaulted and now subject to review under *Martinez* and *Trevino*.

Estoppel doctrines are typically applied where there has been some form of substantive reliance on the prior inconsistent position. *See, e.g.*, *Hossaini v. Western Missouri Medical Center*, 140 F.3d 1140, 1143 (8th Cir. 1998) ("Among the circuits that have recognized judicial estoppel, the apparent majority view is that the doctrine applies only where the allegedly inconsistent prior assertion was accepted or adopted by the court in the earlier litigation."); *Total Petroleum, Inc. v. Davis*, 822 F.2d 734, 737 (8th Cir. 1987) ("Equitable estoppel prevents a party from denying a state of facts that he has previously asserted to be true if the party to whom the representation was made has acted in reliance on the representation and will be prejudiced by its repudiation."). The application of judicial estoppel should be made in light of "the rule allowing parties to plead

alternative legal theories." *Total Petroleum, Inc.*, 822 F.2d at 737 n.6. Whether or not Sasser's positions are inconsistent, it is clear from the procedural history of this case that Sasser's earlier position was not accepted by the Court. Sasser gains no unfair advantage and the Respondent suffers no unfair detriment if Sasser is not estopped from asserting that his habeas claims are new. The Respondent's argument is rejected.

Sasser argues that the Respondent should be estopped from arguing that Sasser's claims of ineffective assistance of counsel are not new claims. Specifically, Sasser argues that the Respondent argued to this Court that Sasser's postconviction counsel failed to effectively present the claims of ineffective assistance of counsel and the supporting facts to the state courts. Sasser argues that this Court agreed when it denied Sasser relief due to procedural default, and that the Respondent's position now—that these claims were raised in the state proceedings—is inconsistent with the Respondent's earlier, successful position.

The Court has reviewed the record in this case and agrees that the Respondent previously argued before this Court that Sasser's habeas claims[3] were new claims, and that Respondent partially succeeded in convincing the Court of that position. In particular, in its response to the amended habeas petition, the Respondent argued that "the only ineffective-assistance claim that was fairly presented to and decided by the state courts concerned only counsel's failure to seek a limiting instruction for the jury's consideration of Jacki Carter's testimony, and that is the only ineffective-assistance claim that is preserved for review here." (Doc. 24, p. 3). In its May 28,

---

[3] The Court's analysis on the estoppel issue focuses on the claims in the amended petition (Doc. 23). Although Sasser was allowed to file a second supplemental and amended petition (Doc. 48), at the time that document was filed, the Court of Appeals retained jurisdiction over the ineffective assistance claims, and the amendment was allowed for purposes of allowing this Court to address the *Atkins* issue.

2002 memorandum opinion and order denying the amended habeas petition, this Court agreed with the Respondent's position, but only with respect to the claims in the amended petition (Doc. 23), ruling that out of the eight grounds listed in the amended petition, "[w]ith the exception of Ground 8, [Sasser] failed to assert and develop any of the remaining grounds set forth in his Amended Petition at the state court level." (Doc. 30, p. 3). Ground 8 was an ineffective assistance claim premised on trial counsel's failure to request a limiting instruction after the State of Arkansas presented victim testimony from Sasser's previous conviction for battery, rape, and kidnapping. (Doc. 23, p. 3).

The "remaining grounds" in Sasser's Amended Petition that are premised on ineffective assistance of counsel, and which the Respondent successfully argued were "new" claims, are: (1) a general claim that Sasser was deprived of his right to effective assistance; and (2) a claim, in light of standards promulgated by the Arkansas Public Defender's Commission requiring a minimum of two attorneys in capital cases, that Sasser's counsel was ineffective when he did not request additional counsel and a continuance, and when he did not object to being required to proceed alone. The first of these is entirely too general to constitute a claim. It states a legal basis, but no factual basis. The second, a claim premised on the need for additional counsel, may be a reason that trial counsel failed to prepare for the sentencing phase of the trial, obtain a timely psychological evaluation of Sasser, or meaningfully consult with a mental health professional, but it is not one of the three ineffective assistance claims under consideration on remand. While the Respondent would be judicially estopped from arguing that the "additional counsel" claim is not a new claim, because that is not one of the ineffective assistance claims under consideration on remand from the Eighth Circuit, estoppel does not apply.

### 2. New Claims/Procedural Default

Because there is no estoppel, the Court must now compare the three claims on remand with those raised in the state proceedings to determine whether any is new or procedurally defaulted. In determining whether these claims are the same as any claim exhausted in state court proceedings or otherwise raised in these proceedings, the Court is mindful that

> [a] petitioner must present "*both* the *factual and legal* premises" of his claims to the state courts in order to preserve them for federal habeas review. This standard applies to claims that trial counsel has been constitutionally ineffective. A habeas petitioner who asserts only broadly in his state petition for relief that his counsel has been ineffective has not immunized his federal habeas claim's specific variations from the effects of the state's procedural requirements. Nor has a petitioner who presents to the state courts a broad claim of ineffectiveness as well as some specific ineffectiveness claims properly presented all conceivable specific variations for purposes of federal habeas review.

*Flieger v. Delo*, 16 F.3d 878, 884–85 (8th Cir. 1994) (citations omitted).

In the Arkansas Rule 37 proceedings, Sasser's final amended petition broadly alleged ineffective assistance of counsel at both the guilt and penalty phases of trial. *See* Respondent's Ex. 2, Vol. 1, p. 130 (Second Amended Petition for Relief Under ARCrP, Rule 37).[4] Specifically, Ground IV of the petition argued that "Sasser's conviction should be set aside because he was deprived of his right to effective assistance of counsel as guaranteed by the U.S. Const., amend. 6 & 14, and Ark. Const., Art. 2, §§ 8, 10." *Id.*, Vol. 1, p. 140. A thorough review of the claims made in Sasser's state proceedings is necessary to compare those claims to the claims the Court must consider on remand.

Sasser's Rule 37 petition argued trial counsel was ineffective at the penalty phase in part because: (1) trial counsel "failed to prepare for his expert's testimony and was unable to adequately present compelling evidence of mitigating circumstances;" (2) trial counsel "failed to investigate

---

[4] Unless noted otherwise, all exhibit citations in this opinion are to exhibits from the February 2016 hearing.

for the penalty phase and to call additional witnesses to adduce evidence of relevant mitigating factors;" and (3) trial counsel "failed to counter the State's erroneous characterization of the role of mental disease/defect in penalty mitigation." *Id.*, Vol 1, pp. 145, 146, 147. The first claim is premised on trial counsel's failure to interview or prepare Mary Pat Carlson, or to employ her testimony to rebut the State's experts. The second is premised on trial counsel's failure to interview witnesses or obtain records from former employers or the Department of Correction, which would have showed Sasser's favorable qualities, good work history, and amenability to incarceration. The third is premised on trial counsel's failure to object to the prosecution's mischaracterization of the law when the prosecution argued to the jury that evidence of mental disease should not be considered in the penalty phase because if there were any such evidence, it would have been raised in the guilt phase.

In its order ruling on the state postconviction proceedings, the Miller County Circuit Court divided the ineffective assistance claims presented to it into two sections: "Failure to Call Certain Witnesses in the Penalty Phase" and "Failure to Adequately Prepare Expert Witness." *Id.*, Vol. 1, pp. 261, 263. With respect to the first section, the Circuit Court noted "[t]rial counsel is alleged to have rendered ineffective assistance for not having called four witnesses to wit, Milton Castleman, Gerald Whistle, Willie Carroll and Janet Thomas to testify in his behalf in the penalty phase." *Id.*, Vol. 1, p. 261. The testimony of these witnesses would have been presented to show that Sasser "would be able to control his impulses in the structured environment of prison and thus place his mental disorder in a more mitigating light." *Id.*, Vol. 1, pp. 261–62. With respect to the second section, the Circuit Court stated "[t]rial counsel is taken to task for failing to have adequately prepared the testimony of his only expert witness during the penalty phase, Mary Pat Carlson." *Id.*, Vol. 1, p. 263.

Based on the evidence presented and the parties' briefs, the Court finds that the first claim of ineffective assistance of trial counsel delineated by the Eighth Circuit for this Court's examination—trial counsel was ineffective when he failed to prepare for the sentencing phase of the trial—is a recharacterization of the ineffective assistance claims presented in the state court, and was fairly presented to the state court during the postconviction process. As summarized in Sasser's post hearing brief, the first claim under consideration in this Court argues that

> Trial counsel's performance fell well below prevailing professional norms when he failed to ensure that Mr. Sasser was represented by two qualified lawyers, failed to perform necessary investigations, unreasonably failed to secure competent expert mental health assistance that was obviously needed, unreasonably failed to secure competent and qualified investigative assistance, unreasonably failed to use properly the investigative assistance he was provided, unreasonably failed to interview and present witnesses who would have provided Mr. Sasser's jury with compelling mitigating evidence, failed to investigate and present evidence of Mr. Sasser's intellectual deficiencies, and unreasonably failed to investigate and present evidentiary exhibits that would have supported Mr. Sasser's case for a life sentence.

(Doc. 273, pp. 5–6).

Some of these "failures of preparation" in the first claim are recharacterizations of the second and third claims now under consideration in these federal proceedings, and their inclusion in this first claim is representative of Sasser's apparent habit of trying to shoehorn multiple claims into one. *Cf. Sasser II*, 735 F.3d at 850 ("At every turn in these proceedings, Sasser has raised new ineffective assistance of counsel claims or recast old claims in new ways. Having carefully scrutinized Sasser's numerous filings, we count no fewer than sixteen ineffective assistance of counsel claims raised under the umbrella of the second ground certified for appeal."). For example, there is little or no fundamental difference in claiming trial counsel failed to adequately prepare for the sentencing phase of the trial by failing to secure competent expert mental health assistance and in claiming trial counsel failed to meaningfully consult with a mental health professional.

Others are essentially the same claims before the state court. For example, there is little or

no fundamental difference in claiming trial counsel failed to interview and present witnesses who would have provided Mr. Sasser's jury with compelling mitigating evidence (Doc. 273, p. 6) and in claiming that trial counsel failed to investigate for the penalty phase and to call additional witnesses to adduce evidence of relevant mitigating factors. Respondent's Ex. 2, Vol. 1, pp. 144–47.

Still others are so far afield of the four claims identified on remand that it appears Sasser is attempting to revive claims already dismissed by the Eighth Circuit. For example, Sasser claims in Ground VII of his petition that he was "deprived of the effective assistance of counsel and is entitled *to a new trial* because he was not represented by two attorneys." (Doc. 48, p. 3) (emphasis added). This is not one of the surviving claims identified by the Eighth Circuit, but Sasser now argues that the claim that trial counsel was ineffective when he failed to prepare for the sentencing phase results from trial counsel not asking for another attorney to be appointed. (Doc. 273, p. 7). A claim is identified by its legal and factual bases. Because the legal and factual bases Sasser argues in the first claim on remand are the same as those that have already been dismissed, or are fundamentally the same as others to be considered on remand, this claim is not amenable to a *Martinez* and *Trevino* analysis. That is, it is not a claim that has been procedurally defaulted and can therefore be excused. Where it is not duplicative of the second and third claims, it is a claim that has already been dismissed.

However, the second and third claims are different. Sasser argues that prevailing professional norms at the time of trial required the early involvement of a qualified and informed mental health expert in order to effectively present mitigation evidence at sentencing. Sasser also argues that prevailing professional norms required trial counsel to present expert witnesses to discuss mental illness, and that any meaningful expert opinion on mental health will be informed

by family and social history. Sasser argues that trial counsel failed to timely seek the appointment of qualified experts in neurology and neuropsychology to conduct a full test battery on Sasser. Sasser also claims that this failure caused trial counsel to be uninformed as to what he needed a mental health expert to do.

Although trial counsel enlisted the help of Mary Pat Carlson, she was family counselor, not a clinical psychologist. Sasser argues that trial counsel provided Carlson with no referral questions, providing her only with a "copy of my file, and she took it from there." (Doc. 273, pp. 17–18). Sasser argues that trial counsel failed to provide Carlson any other records concerning Sasser, including prior incarceration records. Sasser additionally maintains that because trial counsel conducted no investigation, he had no biopsychological history to give Carlson. Sasser argues that trial counsel failed to investigate Carlson's professional licensure, only "assuming" she was qualified. Sasser states Carlson "was not competent, qualified, or licensed to perform the testing she did in this case;" and, Carlson's results were, therefore, "inaccurate and highly aggravating," overestimated "Sasser's intellectual functioning and failed to discover readily apparent organic brain damage." (Doc. 273, p. 18). Sasser also argues that Carlson's trial testimony was extremely prejudicial, testifying that Sasser "'had repressed and denied vast amounts of rage . . . that in the future could be expected to be directed at women, particularly those perceived as being rejecting, unloving and/or having power.'" (Doc. 273, pp. 18–19).

Sasser asserts that had the proper investigations been timely performed and qualified experts been retained prior to trial, trial counsel would have discovered and presented evidence that Sasser had a structural problem with his brain that was objectively evident on tests. Sasser further asserts that testimony would have been presented that these brain impairments were present from a very young age. Finally, Sasser argues that expert testimony from a psychologist would

have established that Sasser's brain impairments had "broad-reaching detrimental effects on his ability to function in the world" and would have established that Sasser was "particularly lacking in his ability to plan, exercise good judgment, and problem solve." (Doc. 275, pp. 8–9).

The most significant distinction between Sasser's Rule 37 claims and the second and third claims as characterized on remand are that the claims in the Rule 37 petition focus on how trial counsel could have been better prepared for the mitigation arguments he actually raised at sentencing with his chosen expert and how those arguments could have been set forth more effectively, while the claims under consideration on remand concern the steps minimally effective trial counsel would have taken with respect to mental health evidence and obtaining a qualified expert in anticipation of mitigation at the sentencing phase. The second claim on remand is not a claim that trial counsel should have investigated earlier so that he could secure Carlson's evaluation earlier and better consult with her and prepare for sentencing. That issue was fully and fairly raised in the Rule 37 proceedings. *See* Respondent's Ex. 2, Vol. 2, pp. 310–60 (testimony of Mary Pat Carlson); pp. 310–14 (Carlson's testimony that trial counsel did not contact her until close to trial and she did not do most of the work she otherwise might have); pp. 335–36 (Carlson's testimony that trial counsel did nothing to inform her about mitigating circumstances he intended to address). It is that trial counsel should have begun his preparations and obtained a psychological evaluation earlier so that he would know that he needed a qualified and licensed expert, and not Carlson, to present mental health evidence in mitigation. The third claim on remand is not that trial counsel should have done a better job in consultation with Carlson to prepare both her and himself for the sentencing phase, but that he should have had meaningful consultation with a qualified and licensed mental health professional. Given the new evidence of Carlson's lack of qualifications and her licensure issues, Sasser's third claim is essentially that his trial counsel

should not have consulted with her at all, and given the evidence of trial counsel's disdain for mental health professionals and how that disdain impacted trial counsel's preparation, it is hard to see how he could ever be effective in having meaningful consultation. The new claims matter because there is also ample evidence calling into question Sasser's mental health issues and organic brain damage, both arguably exacerbated by poverty and other family conditions. These legal and factual bases were not raised below and the facts now alleged "fundamentally alter the legal claim[s] already considered by the state courts." *Vasquez*, 474 U.S. at 260.

Accordingly, the Court finds that the second and third claims of ineffective assistance of trial counsel claims are new claims not fairly presented to the state court. As stated above, Sasser has no available state remedy to exhaust these defaulted claims. *Ward*, 455 S.W.3d at 835. They are procedurally defaulted and subject to an analysis under the second prong of *Martinez* and *Trevino* to determine whether cause exists to excuse the procedural bar.

### B.    Cause to Excuse Procedural Default

"[U]nless postconviction counsel's failure to raise a claim was prejudicial, the claim remains procedurally barred despite *Trevino*." *Sasser*, 743 F.3d at 1151. Cause exists to excuse procedural default if Sasser's postconviction counsel was ineffective and Sasser was prejudiced as a result. *Sasser II*, 735 F.3d at 853 ("Under *Trevino*, Sasser's postconviction counsel's alleged ineffectiveness, if proved, establishes cause for any procedural default Sasser may have committed in not presenting these claims to the Arkansas courts in the first instance." (citations and brackets omitted)).

Ineffectiveness of counsel is analyzed using the *Strickland* standard. The "proper standard for attorney performance is that of reasonably effective assistance. . . . reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 687–88. "The deficient performance

standard is rigorous." *United States v. Brown*, 528 F.3d 1030, 1033 (8th Cir. 2008). "Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "[C]hoices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal. Therefore, absent contrary evidence, we assume that appellate counsel's failure to raise a claim was an exercise of sound appellate strategy." *Brown*, 528 F.3d at 1033 (citations omitted).

"[I]neffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." *Strickland*, 466 U.S. at 693. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. An evidentiary hearing is required where the petitioner's underlying claim is "potentially meritorious." *Sasser II*, 735 F.3d at 851.

The remaining two procedurally defaulted claims the Court must analyze are Sasser's claims that trial counsel was ineffective when he failed to obtain a timely psychological evaluation

of Sasser and when he failed to meaningfully consult with a mental health professional. Cause exists if Sasser's postconviction counsel was unreasonable in failing to present these claims in the state proceedings and if, in the absence of that failure, there is a reasonable probability that the state postconviction proceedings would have been different. This second prong will, of necessity, also require a merits analysis of trial counsel's performance.

### 1. Postconviction Counsel's Ineffective Assistance

Following conviction and direct appeal,[5] Sasser sought postconviction relief pursuant to Arkansas Rule of Criminal Procedure 37. At the state postconviction level, Sasser's final amended petition alleged, broadly, ineffective assistance of counsel, both at the guilt and penalty phase of trial. A hearing was held on Sasser's state postconviction claims on December 16, 1996. Respondent's Ex. 2, Vol. 2. Seven witnesses—Milton Castleman, Gerald Whistle, Mary Pat Carlson, Thomas Crosthwait, Willie Carroll, Bill Sillivan, and Janet Thomas—testified in support of Sasser's case, while the State presented two witnesses—James Robert Blackburn, and Charles Potter. *Id.*, Vol. 2, pp. i–ii. The circuit court denied relief on the postconviction petition in September 1997. Respondent's Ex. 2, Vol. 1, p. 252. Sasser appealed the denial of postconviction relief, and the Supreme Court of Arkansas affirmed the denial in July 1999. *Sasser v. State*, 993 S.W.2d 901, 903 (Ark. 1999).

Postconviction counsel was employed with the Arkansas Capital Resource Center when she began work on the Sasser case in August 1995. The Arkansas Capital Resource Center was funded by a federal grant and was technically without funding for the handling of matters in state

---

[5] Sasser appealed his conviction to the Supreme Court of Arkansas. Sasser's appeal asserted only one issue: the trial court abused its discretion when it permitted the state to introduce "prior acts" testimony in violation of Arkansas Rules of Evidence 404(b) and 403. The Supreme Court affirmed Sasser's conviction on July 17, 1995. *Sasser v. State*, 902 S.W.2d 773 (Ark. 1995).

court. To further complicate matters, during the summer of 1995 it became evident to the staff of the Resource Center that federal funding was running out and the staff began looking for other employment. The Resource Center finally completely closed for business in March 1996, several months after postconviction counsel's October 1995 filing of the initial postconviction petition. At the time the Resource Center closed, postconviction counsel filed a motion with the state court seeking to be appointed individually to represent Sasser. The motion for appointment of counsel was not ruled on until September 1996. Upon appointment, postconviction counsel was awarded reimbursement for her expenses and compensation with respect to her representation in an amount not to exceed $1,000. Postconviction counsel's reimbursement budget was to cover expenses—for travel, service of subpoenas, witness fees, etc.—and attorney fees. Postconviction counsel was unemployed for several months after the closing of the Resource Center. In October 1996, postconviction counsel was hired by the Pulaski County Public Defender's Office. Although representing Sasser was not part of her job duties, her employer agreed to allow her to continue her representation of Sasser in her spare time.

Despite the many hindrances associated with her representation, postconviction counsel did significant work on the case. Her case file is detailed and extensive. Petitioner's Ex. 47. Prior to the Resource Center's closure, an investigator with the Resource Center performed some background research on Sasser's social history. In addition, postconviction counsel gathered the police files and the files of the prosecutor. Postconviction counsel met with Sasser in prison and communicated with him numerous times. She traveled and met with members of Sasser's family as a group, including his mother and siblings. Postconviction counsel attempted to meet with Sasser's former girlfriend and his child. She gathered medical information, and prison records, and interviewed some of Sasser's former employers, including Castleman and Whistle.

Postconviction counsel met with Willie Carroll, Sasser's childhood friend. She met with Mary Pat Carlson and gathered records from Southwest Mental Health Counseling concerning the mental evaluations which were given to Sasser.

This investigative work was not enough to qualify as reasonable, however. Much of it was performed prior to the closure of the Resource Center, and was characterized as a good but "minimal start" by Richard Burr, Sasser's standard of care expert. Much of it fell far short of the applicable best practices identified in the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases.[6] While these guidelines are not binding precedent, without some articulated reason why postconviction counsel would deliberately ignore them, the guidelines are good evidence that her failures in investigation and representation were unreasonably deficient, rather than strategic. Postconviction counsel did not gather birth certificates, death certificates, or other documents of a social history nature. She did not meet with family members individually or specifically investigate the family history of poverty. She did not become aware that Sasser did not technically graduate from high school, or that he was not mentally qualified to enlist in the military and that he hid that fact from his family. Postconviction counsel did not request additional funding and did not make a record for the needed additional expenses for a mitigation expert or mental health expert. As a result, postconviction counsel did not hire a mitigation expert. Postconviction counsel did not request that the state appoint another attorney to serve as second-chair. Furthermore, postconviction counsel did not hire a mental health expert, but instead focused on how Carlson, a marriage and family counselor,

---

[6] While the ABA Guidelines are not a required standard, they have long been referred to as "guides to determining what is reasonable." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (citing *Strickland*, 466 U.S. at 688 and *Williams*, 529 U.S. at 396).

could have been a better witness if properly informed by trial counsel. Without a qualified mental health expert, postconviction counsel was unable to understand or effectively present to the postconviction court why trial counsel's mitigation case was wholly insufficient. As evidenced by the testimony to this Court, qualified mental health experts would have been able to rebut the state's expert evidence and present an accurate picture of Sasser's mental health.

It is true that postconviction counsel's decisions were constrained by her circumstances. The Resource Center closed; she was without employment and was unable to find another attorney to take on Sasser's case; after seeking to be appointed, her motion lagged with the state court for months; after appointment, she was given the meager budget of $1,000. These circumstances indicate that not all of postconviction counsel's deficiencies were her own failings. They also make clear that her deficiencies were not reasonable strategic choices, but were another facet of the systematic operation of Arkansas state proceedings to deny capital defendants "meaningful review of a claim of ineffective assistance of trial counsel." *Cf. Sasser II*, 735 F.3d at 853. Postconviction counsel's investigation and representation were not reasonably effective.

## 2. Prejudice Due to Postconviction Counsel's Ineffective Assistance

Having found postconviction counsel's representation was not reasonably effective, the Court must analyze whether Sasser was prejudiced by that ineffective assistance of counsel. If there was no prejudice, there is no cause to excuse the procedural default.

Whether Sasser was prejudiced by postconviction counsel's failure to raise Sasser's surviving claims about trial counsel's ineffective assistance at the sentencing phase depends on whether trial counsel was actually constitutionally ineffective by failing to obtain a timely psychological evaluation of Sasser and failing to meaningfully consult with a mental health professional. If trial counsel's failure to do these things was an unreasonable deficiency rather

than a reasonable strategic decision, and if there is a reasonable probability that the outcome would be different had trial counsel provided effective representation, then postconviction counsel's procedural default on these issues in the postconviction proceedings would be prejudicial, and would provide cause to excuse the procedural default.

At the evidentiary hearing held by this Court, trial counsel testified that throughout the pretrial period, and up until approximately three weeks before trial, he was expecting to be able to reach a plea agreement, avoiding the death penalty. Trial counsel testified that he really did not prepare for the sentencing phase during the time he spent trying to reach a plea agreement. Trial counsel characterized his strategy as "trying to . . . tug on their heart strings a little bit to keep them from giving the death penalty." Respondent's Ex. 2, Vol. 2, p. 457.

In February 1994, approximately two and a half weeks prior to the trial, trial counsel requested funding for the services of both an investigator and a mental health expert. When funding was secured, trial counsel hired Bill Sillivan to perform an investigation of the crime, with the goal being to avoid the death penalty. Sillivan's investigation was performed in a limited two- to three-week period before trial. Although trial counsel testified that Sillivan "checked out everything I was interested in checking out," the evidence reveals that Sillivan focused his investigation on the crime, and any possible alibi for Sasser, rather than on any psychological or mental health issues that could serve as mitigating factors with respect to sentencing.

At approximately the same time Sillivan was hired, trial counsel hired Mary Pat Carlson as a mental health expert. Trial counsel testified that he hired Carlson because she had done an evaluation for trial counsel in the past. Trial counsel provided Carlson with a copy of his file "and she took it from there." Carlson was not a psychiatrist or psychologist; she was a family counselor. Trial counsel assumed, without confirming, that Carlson had the qualifications to conduct the

testing necessary. Trial counsel testified that a more qualified expert was probably available in the area, but, he said, "I just take those kind of people with a grain of salt anyway . . . ." Respondent's Ex. 2, Vol. 2, p. 458. During the February 2016 hearing, trial counsel was asked what he meant by that statement. Trial counsel stated that he "didn't find that [mental health experts] were all that credible. I didn't think they knew what they were talking about about half the time." (Doc. 265, p. 26:9–1). Testimony was presented in the February 2016 hearing that Carlson was not competent, qualified, or licensed to perform the testing she performed with respect to Sasser, and that she overestimated Sasser's intellectual functioning and failed to discover organic brain damage. Testimony was also presented that disciplinary actions were pending with respect to Carlson's license.

Evidence was presented concerning the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. Petitioner's Ex. 50. The relevant ABA Guidelines, which were in effect from 1989 until 2003, provide that defense counsel should perform an investigation into mitigating evidence which "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Id.*, p. 85 (Guideline 11.4.1(C)). The ABA Guidelines include, in a list of areas for investigation relevant to the sentencing phase:

> medical history, (mental and physical illness or injury, alcohol and drug use, birth trauma and develop- mental [sic] delays); educational history (achievement, performance and behavior) special educational needs (including cognitive limitations and learning disabilities); military history (type and length of service, conduct, special training); employment and training history (including skills and performance, and barriers to employability); family and social history (including physical, sexual or emotional abuse); prior adult and juvenile record; prior correctional experience (including conduct on supervision and in the institution, education or training, and clinical services; and religious and cultural influences.

*Id.*, p. 86 (Guideline 11.4.1(D)(2)(C)).

Sasser also presented testimony from Richard Burr with respect to the standard of care required of defense counsel in a capital case. Burr explained the reason for extensive mitigation phase investigations leading up to a capital trial. Among other things, Burr testified that trial counsel failed to provide effective assistance of counsel during the penalty phase of Sasser's trial because trial counsel conducted no life history or social history investigation, which caused him to work ineffectively with the mental health expert that he called to the stand.

Sasser presented easily attainable documentary evidence surrounding significant events in Sasser's childhood, such as his birth records, death records concerning his father's tragic death when Sasser was two years old, and Arkansas Worker's Compensation Records evidencing the meager benefits provided to the family following Sasser's father's death. This evidence, along with testimony from witnesses, provides insight into the dire financial, economic, and social aspects of Sasser's childhood. Sasser's school records were presented at the February 2016 hearing. Those records, along with testimony from former teachers, established Sasser's lack of ability in school, and set forth sufficient evidence that Sasser had deficits in intellectually functioning from an early age and was "socially promoted" through school, rather than actually graduating from high school. In addition, testimony was presented about Sasser's failure to qualify for military service, and his attempts to cover up that failure. Testimony was also presented from Sasser's coworkers and supervisors concerning his lack of mental ability.

All of this evidence would have been uncovered had trial counsel made a reasonable investigation, and would have assisted him in presenting an effective mitigation case with respect to Sasser's mental health and psychological state. Had this information been provided to Sasser's mental health expert, Carlson, or to Dr. James Blackburn, who testified for the prosecution during the trial, their trial testimony likely would have been different.

"It is unquestioned that under the prevailing professional norms at the time . . . counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'" *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)).  Trial counsel simply did not investigate or compile a social history of Sasser, and there is no reasonable strategic basis for that decision.  It is not unreasonable to hope for a plea and a sympathetic jury, but a reasonable strategy requires some substantive preparation, as well.  Trial counsel's failure to investigate was unreasonable, and his investigation was too little, too late.

Trial counsel failed to timely request and meaningfully consult with a mental health professional.  He waited to secure funding and contact Mary Pat Carlson until approximately two and a half weeks before trial.  Trial counsel simply provided Carlson with his file as preparation.  Not only did trial counsel fail to effectively consult with a mental health expert and supply her with the significant social history which would have been available if he had performed a proper investigation, trial counsel also failed to carefully choose a properly qualified expert under the circumstances.  Had trial counsel sought out a mental health professional in timely fashion, he likely would have discovered the professional he initially selected was not qualified.  Had trial counsel effectively chosen an appropriate and qualified expert who could perform a psychological evaluation, evidence could have been presented to show that Sasser suffered from mental deficiencies.

The Court need not rely on speculation that such evidence could have been presented.  During the February 2016 hearing, Sasser presented the testimony of Dr. Pamela Blake, a neurologist, Dr. Dale G. Watson, a neuropsychologist, and Dr. Leslie Lebowitz, a clinical psychologist.  Each expert had evaluated Sasser following review of Sasser's background, including various affidavits concerning Sasser's early life, Sasser's academic and social records,

and records from Sasser's previous psychological evaluations and cognitive testing.  Both Dr. Blake and Dr. Watson concluded that Sasser suffered moderate neurological impairment or dysfunction.  Dr. Lebowitz concluded that Sasser "endured significant adversity throughout his development in the form of extreme poverty and maternal depression and that he was impaired and that his impairment in all likelihood rendered that adversity more overwhelming and harmful than it might have been for somebody else."  (Doc. 265, Volume 3, p. 620.)

Had trial counsel effectively presented a mitigation case, there is a reasonably probability that the jury would have returned a different sentence.  During Sasser's jury trial, "the jury found one aggravating circumstance: that appellant had previously committed another felony an element of which was the use or threat of violence to another person or creating a substantial risk of death or serious physical injury to another person. The jury found three mitigating circumstances: that appellant would be a productive inmate, had a supporting family of him as an inmate, and had stipulated he caused the victim's death."  *Sasser v. State*, 902 S.W.2d at 777.  Had the jury been presented with the mental and psychological health mitigation case presented at the February 2016 hearing, there is a reasonable probability that the jury would have chosen a life sentence instead.

Because trial counsel's ineffective assistance in failing to obtain a timely psychological evaluation of Sasser and meaningfully consult with a mental health professional prejudiced Sasser at the sentencing phase of trial, postconviction counsel's failure to raise these claims in postconviction proceedings was ineffective assistance of counsel and prejudiced Sasser.  Because Arkansas as a systematic matter did not afford Sasser meaningful review of his claims of ineffective assistance of trial counsel, the exception to *Coleman* outlined in *Martinez* and *Trevino* applies, and ineffective assistance of postconviction counsel can provide cause to excuse a procedural default.  The procedural default is therefore excused.  Furthermore, because trial

counsel was unconstitutionally ineffective in these areas, Sasser's petition must be granted.

**IV.    Conclusion**

Because the Court is addressing the *Atkins* issue in a separate opinion, a final order incorporating both opinions will be entered separately.

ENTERED this 2nd day of March, 2018.

/s/ P. K. Holmes, III
P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE