UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

ANDREW SASSER                                                                PETITIONER

v.                                        No. 4:00-CV-04036

WENDY KELLEY, Director,
Arkansas Department of Correction                                          RESPONDENT

## MEMORANDUM OPINION

On March 20, 2014, the United States Court of Appeals for the Eighth Circuit issued a

mandate (Doc. 180) in this case affirming in part and reversing in part this Court's previous

judgments, and remanding the matter for proceedings consistent with the Eighth Circuit's opinion.

## I.      Background

On May 4, 1994, Petitioner Andrew Sasser was convicted of capital murder and sentenced

to death for the July 12, 1993 homicide of Jo Ann Kennedy. *See Sasser v. State*, 902 S.W.2d 773

(Ark. 1995). The murder occurred while Kennedy worked as a clerk at an E-Z Mart convenience

store in Garland City, Arkansas. *Id*. at 774–75. Following a direct appeal, and Sasser's effort to

obtain Arkansas state court postconviction relief pursuant to Arkansas Rule of Criminal Procedure

37, Sasser sought federal relief through a writ of habeas corpus. (Doc. 3). The Court dismissed

the petition but granted a certificate of appealability with respect to several issues. (Docs. 30 and

34). During Sasser's first appeal to the Eighth Circuit, and following the Supreme Court's decision

in *Atkins v. Virginia*,[1] the Eighth Circuit remanded for a determination of whether Sasser was

ineligible for the death penalty because of mental retardation,[2] but retained jurisdiction over the

---

[1] *Atkins v. Virginia*, 536 U.S. 304 (2002), holds that execution of an intellectually disabled
person is prohibited by the Eighth Amendment to the Constitution.

[2] The term "mental retardation" is medically outdated and offensive to many people. The
phenomenon is more accurately described as an "intellectual disability," and it is this Court's

bulk of Sasser's case. After reviewing the *Atkins* issue twice, the Eighth Circuit issued its opinion and mandate remanding to this Court[3] and giving rise to these proceedings. *Sasser v. Hobbs* (*Sasser II*), 735 F.3d 833 (8th Cir. 2013). The Eighth Circuit affirmed dismissal of many of Sasser's claims, but reversed with respect to Sasser's *Atkins* claim and four of his claims of ineffective assistance of counsel at the sentencing phase of Sasser's trial. The Eighth Circuit vacated the Court's denial of relief on those four claims, and the Court's finding that Sasser is not mentally retarded under *Atkins*.

The Eighth Circuit directed the Court to conduct a hearing on the four ineffective assistance of counsel claims to determine whether they are procedurally defaulted claims, and if so, whether they should be excused. *Id.* at 853, 855; *see also Sasser v. Hobbs*, 743 F.3d 1151, 1151 (8th Cir. 2014) (denying rehearing) ("It should be clear the district court, on remand, must consider whether Andrew Sasser's state postconviction counsel failed to raise the four potentially meritorious ineffectiveness claims." (citation and brackets omitted)). The Eighth Circuit also directed the Court to make a new *Atkins* finding using the appropriate standard. *Sasser II*, 735 F.3d at 855. The Courts' ineffective assistance findings are addressed in a separate opinion.

On remand, the Court denied Sasser's motion to file an amended petition and directed the parties to file post-remand briefs on Sasser's *Atkins* claim. Sasser filed his brief (Doc. 187) on September 17, 2014, and the Respondent filed a response brief (Doc. 195) on December 17, 2014.

---

obligation to determine whether Sasser suffers from an intellectual disability that would make his execution unconstitutional. In doing so, in this memorandum opinion, the Court utilizes the outdated term for consistency with prior proceedings because the Arkansas statutory legal standard, the witnesses in this matter, and the majority of older legal authorities cited by the Court on this issue describe the phenomenon as "mental retardation."

[3] This case was initially assigned to Hon. Harry F. Barnes. On November 13, 2009 the case was reassigned to Hon. Jimm Larry Hendren. On March 25, 2014, following the most recent remand, the case was reassigned to the undersigned.

Sasser later filed notices of supplemental authority (Doc. 205, 279, 280).

## II.     Applicable Law

In 2002, the United States Supreme Court found that the Eighth Amendment "'places a substantive restriction on the state's power to take the life' of a mentally retarded offender." *Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (quoting *Ford v. Wainwright*, 477 U.S. 399, 405 (1986)). The *Atkins* Court left "'to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" *Id*. at 317 (quoting *Ford*, 477 U.S. at 416–17).

Even prior to *Atkins*, Arkansas provided a statutory right against execution for persons "with mental retardation at the time of committing capital murder." Ark. Code Ann. § 5-4-618. Following *Atkins*, the Arkansas Supreme Court has consistently construed this statutory right to be equivalent to the federal constitutional right established in *Atkins*. *See Anderson v. State*, 163 S.W.3d 333, 354–55 (Ark. 2004). Arkansas law defines mental retardation as follows:

(A)     Significantly subaverage general intellectual functioning accompanied by a significant deficit or impairment in adaptive functioning manifest in the developmental period, but no later than age eighteen (18) years of age; and

(B)     A deficit in adaptive behavior.

Ark. Code Ann. § 5-4-618(a)(1). A defendant must prove that he meets the mental retardation standard "by a preponderance of the evidence." Ark. Code Ann. § 5-4-618(c). To meet this burden, Sasser must prove four factors:

1.     "Significantly subaverage general intellectual functioning";
2.     "[A] significant deficit or impairment in adaptive functioning";
3.     That both of the above "manifest[ed] . . . no later than age eighteen"; and,
4.     "A deficit in adaptive behavior."

*Sasser II*, 735 F.3d at 843 (quoting Ark. Code Ann. § 5-4-618(a)). The third prong modifies both the first and second prongs, while the fourth prong asks the same questions as the second prong,

unbounded by the requirement of juvenile manifestation.

If Sasser can show that he suffered from an intellectual disability, "either (a) at the time of committing the crime or (b) at the presumptive time of execution," to an extent that meets Arkansas's mental retardation legal standard, his execution will be prohibited by the Eighth Amendment. *Id.* at 846.

## III.    Evidence Presented

At the 2010 evidentiary hearing regarding Sasser's Atkins claim, the Court heard testimony from Mr. Hollis Sasser, Dr. Jethro Toomer, Prof. Tom Smith, Dr. Roger Moore, Mr. Grant Harris, Sgt. John Cartwright, Mr. Bryan Olinger, and Dr. Kevin McGrew. Along with the testimony of witnesses, Sasser submitted exhibits numbered 1–4,[4] which consisted of the following: Petitioner's Exhibit 1: Report of Dr. Jethro Toomer, consisting of three volumes; Petitioner's Exhibit 2: Curriculum Vitae and report of Professor Tom Smith; Petitioner's Exhibit 3: Report of Dr. Kevin McGrew and Appendix, consisting of five volumes. The Respondent submitted exhibits numbered 1–3, which consisted of the following: Respondent's Exhibit 1: Report, Raw Data, and Materials of Dr. Roger Moore, consisting of seven volumes; Respondent's Exhibit 2: Diagram showing correspondence between Sasser's test results and the normal distribution curve; Respondent's Exhibit 3: Arkansas Department of Finance and Administration Driver Permit/License Record for Sasser.

As a summary of the evidence, the Court fully incorporates the Eighth Circuit's description in *Sasser II*:

Beginning on June 15, 2010, the district court held a two-day evidentiary hearing

---

[4] Petitioner's Exhibit 4 was "just a continuation of 3" and was accepted ultimately as Petitioner's Exhibit 3. (Doc. 157, p. 283 [page cites to this document use the document's internal pagination, rather than CM/ECF pagination]). Unless noted otherwise, all exhibit citations in this opinion are to exhibits from the June 2010 hearing.

on Sasser's Atkins claim. Sasser first called three witnesses: his brother, Hollis; Dr. Jethro Toomer, a psychologist; and Professor Tom Smith, a special education expert. The State, in turn, called four witnesses: Dr. Roger Moore, a psychologist; Grant Harris; Sergeant John Cartwright; and Brian Hollinger. Sasser called one witness in rebuttal: Dr. Kevin McGrew, a psychologist. We recount only the evidence relevant to this appeal.

## Dr. Toomer's Testimony

Dr. Toomer evaluated Sasser in person, conducting an intelligence quotient (IQ) test: the Wechsler Adult Intelligence Scale, fourth edition (WAIS–IV). Dr. Toomer also administered several other psychological tests and interviewed numerous individuals about Sasser's background. Dr. Toomer concluded Sasser "met the criteria for mental retardation [in 1994]." He based his conclusion on qualitative factors in addition to evidence of Sasser's IQ scores, which were 79 in 1994, according to an earlier test, and 83 in 2010, according to Dr. Toomer's test.

Dr. Toomer testified the IQ score of 79 Sasser obtained in 1994 was based on an outdated set of scoring norms, resulting in an inaccurately high result. Specifically, the 1994 score was from the WAIS–R, a test whose scoring norms were developed in 1980. IQ scoring norms rapidly become outdated because an IQ score is a relative rather than an absolute measure: IQ tests including the WAIS–R and WAIS–IV are normed such that 100 is the mean score, meaning approximately 68% of the U.S. population would score between 115 and 85, one standard deviation (15 points) above and below the mean. Approximately 2% of the U.S. population would score 70 (i.e., two standard deviations from the mean) or below. For several decades, however, the U.S. population's average raw IQ score has risen each year.[1] *See, e.g.*, James R. Flynn, *Massive IQ Gains In 14 Nations: What IQ Tests Really Measure*, 101 Psychol. Bull. 171 (1987). Thus, an IQ score of 100 under current scoring norms would likely have been close to 110 under scoring norms in effect thirty years ago. This change in IQ scoring norms over time is referred to as the "Flynn effect." *See, e.g.*, Richard E. Nisbett et al., *Intelligence: New Findings and Theoretical Developments*, 67 Am. Psychologist 130, 148 (2012).

1        Although this rise in raw IQ scores is persistent and widely recognized, psychologists heavily debate its causes. *See, e.g.*, Ted Nettelbeck & Carlene Wilson, *The Flynn Effect: Smarter Not Faster*, 32 Intelligence 85 (2004); Joseph L. Rodgers, *A Critique of the Flynn Effect: Massive IQ Gains, Methodological Artifacts, or Both?*, 26 Intelligence 337, 354 (1999) ("Even with a healthy dose of skepticism, the [Flynn] effect rises above purely methodological interpretation, and appears to have substantive import.").

To correct for the Flynn effect, Dr. Toomer testified Sasser's IQ score from 1994 should be reduced by four points to 75, a score falling within the 70–75 outer range consistent with mental retardation. *Cf., e.g.*, Jack M. Fletcher et al., *IQ Scores*

*Should Be Corrected For the Flynn Effect in High–Stakes Decisions*, 28 J. Psychoeducational Assessment 469, 472 (2010) (finding IQ scores should be adjusted by a mean of 3 points per decade from the date scoring norms are developed). Dr. Toomer testified that because of the measurement error inherent in IQ tests, a score of 75 indicated that Sasser's actual IQ almost certainly fell between 70 and 80 (i.e., an error of +/− 5 points). Dr. Toomer testified that Sasser's 2010 IQ score was likely higher because he had been in a structured prison environment for an extended period of time. Dr. Toomer explained, "research shows that what tends to be enhanced ... is the area of verbal reasoning on people who have been incarcerated."

Dr. Toomer's diagnosis also relied on qualitative factors. Notably, Sasser had a long history of intellectual and academic difficulties. In high school, he was placed with students in the bottom performance level, indicating that he was a "special education" student despite the fact Arkansas, at the time, did not offer dedicated programs for "special education" students. His grades were consistently poor despite the simplicity of his classes. He was unable to graduate from high school; instead, the school gave him, like all students who failed to meet the minimum graduation requirements, a "certificate of attendance." Apart from time in prison, Sasser lived with his mother virtually his entire life, and he was unable to live independently. After high school, he attempted to join the army, but his dismal performance on the Armed Services Vocational Aptitude Battery (ASVAB) disqualified him. Apparently ashamed of telling his family of this failure, he spent several weeks pretending to be in the Army, hiding in an abandoned cabin in the woods near his mother's home and sneaking into her house to get food.

Sasser never had a checking account or a credit card, did not obtain a driver's license until he was twenty-eight years old, and had extraordinary difficulties performing even the simplest manual labor jobs. For example, he worked for a time at a chicken processing facility, where his supervisor rotated him through several jobs of decreasing difficulty, trying to find one Sasser could perform. In the end, the only job he was able to perform was the simplest task in the facility: pushing a button to dispense ice. Even a slightly more difficult task—color coding pallets—was too difficult because Sasser often mixed up the colors.

### Dr. Moore's Testimony

Dr. Moore evaluated Sasser in person and conducted several psychological tests, but did not reassess his IQ.[2] Dr. Moore concluded Sasser was not "mentally retarded as defined by Arkansas law." Dr. Moore admitted Sasser had "borderline mental retardation or impaired cognitive functioning that falls into the upper 70s to low 80s." But in Dr. Moore's view, "as th[e] term is statutorily and clinically defined, ... [Sasser] does not suffer from mental retardation." Dr. Moore based his conclusions primarily on the 1994 and 2010 IQ scores, but he also considered several qualitative factors.

2      Because there are substantial "practice effects," Dr. Moore explained, it is not appropriate to administer multiple IQ tests in short succession.

As to Sasser's IQ, Dr. Moore agreed with Dr. Toomer that (1) the Flynn effect is "a genuine and real observation," and (2) norm obsolescence was a justified concern, but he opined that it was not appropriate to adjust the 1994 score for the Flynn effect. Dr. Moore admitted, however, that the American Association on Intellectual and Developmental Disabilities (AAIDD)—the primary organization in the United States dealing with "the assessment and diagnosis of mental retardation"—considered it a "best practice[] in the diagnosis of mental retardation" to recognize the Flynn effect. Dr. Moore disagreed with Dr. Toomer's scoring of the 2010 IQ test, contending that the score should have been 84 rather than 83. Stating no supportive research exists, Dr. Moore denied that spending time in a structured prison environment could raise IQ scores. Dr. Moore testified that the "cutoff of mental retardation" was a score of 70.

As to qualitative factors, Dr. Moore opined that Sasser "appears to have adequate skills to cook for himself as needed, travel independently in the community, hold a job, take care of his personal needs and communicate effectively." Dr. Moore noted that Sasser had maintained over time two significant relationships and fathered a child. Dr. Moore pointed to a small bank loan obtained in Sasser's name as positive evidence of Sasser's adaptive functioning, but Sasser's brother actually procured the loan, completing all the necessary paperwork on Sasser's behalf.

### Other Qualitative Evidence

Both psychologists considered firsthand accounts of Sasser's behavior by people who knew him before he turned eighteen years old. For example, one of Sasser's high school classmates, Janice Washington Briggs, described Sasser's limited interpersonal skills. "[I]f someone did or said something funny, [Sasser] laughed longer than everyone else in an inappropriate way [and] slobbered when he laughed," Briggs said. She said Sasser "was in Group III," and "[t]he students in Group III were Special Education students." After high school, Briggs remembered that Sasser entered into his first relationship, with a woman who "[l]ike [Sasser], ... did not fit in." Dr. Toomer reported Sasser's "social interaction and communication skills" at age 45 "equate[d] with that of an average person age 7 years, 6 months."

*Sasser II*, 735 F.3d at 838 – 41 (heading numbers omitted, alterations and punctuation in original).

In addition to the foregoing recitation of evidence from the Eighth Circuit, the Court notes the following evidence from the 2010 hearing.

### A.      Hollis Sasser's Testimony

Hollis Sasser ("H.B.") is Sasser's brother. He testified that when Sasser was two or three years old, their father passed away after an on-the-job accident at a construction site. The family then moved to an area referred to as "Boyd Hill" where several extended family members also lived. Sasser socialized with other children his age, and children older and younger than him when living at Boyd Hill. Sasser was given chores to do, including feeding chickens by himself and gathering firewood with the family. Sasser would fish with his family using simple fishing equipment such as a pole and worm, but not fishing lures and tackle. Sasser would also clean the fish. H.B. did not notice that Sasser had any significant developmental issues as they were growing up.

All of Sasser's employment was in manual labor jobs. During high school, Sasser had a job with the Crank family. Sasser would help with farm duties in chicken houses and assisted with hay baling in the summer months. Sasser was specifically responsible for removal of dead chickens from the houses, cleaning out water troughs, and feeding chickens. Once the chickens were old enough for removal of the initial water troughs, Sasser would take out the troughs and wash them. When Sasser was about eighteen years old, he attempted to take his paycheck from Mr. Crank and alter the check to receive additional funds. The attempt at altering the check was "messy" and "quite obvious," according to H.B., who saw the check. When Sasser attempted to pass the check at a local store, the clerk, who knew both Sasser and Mr. Crank, determined the check was altered and did not honor it.

Sasser did not date much when he was a teenager and a young adult. He never brought a girl home to introduce to the family and H.B. never saw him go out on a date or attempt to "flirt with a girl." Sasser continued to live with his mother while H.B. and the other siblings moved out of the family home. As a teenager, Sasser had a job babysitting for H.B's four children during the

day while H.B. and his wife went to work.  The children's ages ranged from one to nine years old.  Sasser did not babysit overnight, nor did he ever cook for the children.  Sasser's mother would remain next door for extra supervision.

H.B. was surprised to learn Sasser did not actually graduate high school.  Following high school, Sasser told everyone he was going into military service, specifically the Army.  Because Sasser failed his ASVAB, he instead lived in an abandoned home 100 yards away from H.B.'s house.  To hide during daylight hours, Sasser would go approximately five to six hundred yards up a hill.  When Sasser knew the family would be away, such as during Sunday church hours, Sasser would take canned goods from H.B.'s house.  Sasser would also call his grandparents at those times to keep up the ruse that he was in boot camp.  The house where Sasser stayed at night had no running water or electricity, but it did have some furniture.  To heat food, Sasser would make a campfire.  Sasser was able to maintain this deceit for approximately three weeks.

Thereafter, Sasser found himself out of work and needing a job.  H.B. assisted Sasser in securing a common labor job with Young Construction.  Sasser's job was joining 20-foot lengths of plastic pipe to lay sewer lines for the city.  Sasser would apply a substance to the inside of the pipe fitting, and then push the pipe to make certain the joints were placed together securely.  The pipe had to go in far enough to reach a certain point and it had to be straight.  This job was supervised.  Sasser rode back and forth from this job with H.B.

H.B. also assisted Sasser in securing a job at a lumber mill after Sasser returned home following a period of incarceration.  H.B. transported Sasser to and from the lumber mill.  While working at the lumber mill, Sasser found an old truck he wanted to buy, at which point H.B. spoke with a loan officer and got a personal loan for Sasser.  Sasser signed the paperwork, and it was his responsibility to make the payments on the loan.

Sasser generally lived with his mother except for a period of time he was incarcerated, the short period in which he pretended to join the Army, and another short period of time when he lived with Arch and Margie, his other siblings, due to his employment at the Hudson chicken plant in Hope, Arkansas.

**B.    Dr. Toomer's Testimony**

Prior to the hearing, Dr. Toomer had offered opinion testimony in 18–20 cases since 2006 on an accused criminal defendant's mental retardation. In all of those cases, he found the defendant met the mental retardation standard. Dr. Toomer was retained in other cases where he did not conclude a defendant met the mental retardation standard, but he was not called to testify in those cases.

In addition to the IQ score evidence noted by the Eighth Circuit, Dr. Toomer testified that he attempted to measure what would have been Sasser's level of adaptive functioning when the crime was committed. Adaptive functioning describes a person's level of functioning in community life, such as independent living. This is compared with peer group members in the local community.

There is no instrument developed to do a retrospective adaptive functioning assessment. The Scales of Independent Behavior Revised ("SIB-R") is an instrument used to assess current adaptive functioning deficits. Generally, this instrument is used for planning a course of treatment. The SIB-R has different levels of analysis and is well suited for determination of adaptive functioning deficits because it encompasses quantitative factors as well as qualitative factors. Using this instrument, Dr. Toomer visited with Sasser's friends, family, and peers—specifically with those who could discuss Sasser's functioning within an age range prior to age 18. Using the SIB-R to attempt a retrospective analysis of Sasser's adaptive functioning, Dr. Toomer found

Sasser had eight areas of deficiency: social interaction skills, language comprehension, language expression, time and punctuality, money and value, work skills, home and community orientation, and social interaction.

The AAIDD[5] requires deficiency or weakness in two areas of adaptive functioning to support a diagnosis of mental retardation. A person with mental retardation can perform some tasks in these areas, but still have deficits. For example, such an individual might hold a job, get married, drive a car and have a driver's license, but still be deficient or weak in other areas. The upper level of mental retardation under the Diagnostic and Statistical Manual of Mental Disorders (DSM) used by the experts in this case is mild mental retardation. Moreover, differentiating mild mental retardation from borderline intellectual functioning requires careful consideration of all available information because the two diagnoses appear similar. The difference is that borderline intellectual functioning does not contain the qualitative component of adaptive functioning deficits.

### C.     Dr. Moore's Testimony

Prior to the hearing, Dr. Moore was a clinical and forensic psychologist who had practiced for about 15–16 years. He had testified in other capital habeas proceedings in federal court for the Respondent, and in at least one such instance found the mental retardation standard was met. He has also performed similar work throughout the country in approximately three dozen state and federal *Atkins* cases, for both petitioners and respondents. In at least three cases where he was hired by a state, Dr. Moore determined the subject met the requirements of mental retardation. On four different occasions in 2007, Dr. Moore also gave a presentation, along with the Attorney General for the State of North Carolina, on the topic of handling experts in mental retardation

---

[5] Previously, the American Association on Mental Retardation (AAMR).

trials. Each presentation was to a District Attorney's Association or the Attorney General's office.

Dr. Moore reviewed transcripts from school records, records from the Southwest Arkansas Counseling and Mental Health Center, written transcripts of police interviews, police interview reports, medical examiner's reports, and telephone visitation records. He interviewed over two dozen witnesses to evaluate whether Sasser meets the Arkansas standard for mental retardation. In addition to Sasser's intelligence test scores, Dr. Moore looked at Sasser's aptitude test scores on the Scientific Research Associates Achievement Series (SRA), the Armed Forces Qualification Test (AFQT), two Wide Range Achievement Tests (WRATs), and the Wechsler Individual Achievement Test (WIAT). In 2010, Sasser's spelling sub-test score on the WRAT-4 was in the 18th percentile; the arithmetic score was in the 21st percentile; sentence comprehension was in the 30th percentile; and reading composite was in the 34th percentile.

Dr. Moore testified that when clinical psychologists are faced with test results involving aging norms, they will note the reliability of the scores may be reduced due to aging norms. The best practice is to use the most up-to-date test. With respect to IQ test scores, the 2010 administration would be the most reliable because it was given within a year of the norming dates. Dr. Moore placed Sasser's IQ scores and the other scores from instruments measuring Sasser's cognitive functioning along a bell curve to determine if there was a convergence of data. Dr. Moore found the multiple exams mostly fall within the range between the two IQ scores, lending increased confidence that those IQ scores are accurate. As a result, Dr. Moore concluded that Sasser had impaired cognitive functioning, but did not meet the mental retardation standard.

Dr. Moore agreed with Dr. Toomer that Sasser displayed some deficits in adaptive functioning, but did not believe those deficits were significant enough to meet the mental retardation standard. Dr. Moore testified that for deficits to be "significant" in clinical terms,

Sasser would need to be functioning about two standard deviations below the mean. Dr. Moore questioned the reliability of Dr. Toomer's administration of the SIB-R to retrospectively assess deficits in adaptive functioning because 1) the age equivalent scores were not based on an individual's assessment of Sasser, but were a compilation of many different recollections, and 2) the age for when any given assessment applied varied. Dr. Moore did note that Sasser's overall level of adaptive functioning likely falls below the average to borderline range. He opined that adaptive functioning on the job does not mean an individual must be capable of performing a job requiring abstract thinking, but only that the individual could show up on time and work independently without specific guidance.

### D. Professor Smith's Testimony

Professor Tom Smith, who was dean of the College of Education and Health Professions at the University of Arkansas, testified that in the 1970s, programs for mentally challenged school children were just being implemented in Arkansas, and were minimally funded. There were no recordkeeping requirements on the part of school districts at that time. Dr. Smith never worked in the Lewisville school system, where Sasser was educated, and he did not review Sasser's IQ scores. Dr. Smith also had no information on whether Sasser was served by a Title One program while in school or if Sasser was considered intellectually disabled while in school.

### E. Assistant Director Harris's Testimony

Grant Harris was Assistant Director of Institutions for the Arkansas Department of Correction at the time of the hearing. Prior to that, he was warden of the Varner Supermax unit, which houses death row inmates. In this capacity, he became familiar with Sasser.

Harris testified that prior to Sasser's 1994 conviction, Sasser had been incarcerated in 1989 for an unrelated conviction. He was processed in 1989 through the diagnostic unit, where he was

given a medical evaluation, which included an interview by medical health staff, and an orientation to the procedures for the Arkansas Diagnostic Correction. After a typical processing time, Sasser was placed in the Cummins Unit.

All mentally and physically capable inmates are assigned a job, and if an inmate chooses not to work, he or she is disciplined. Work assignments take into consideration prior employment, institutional needs, education, and background. An inmate can be promoted to a better work assignment or a different Class. Class 2 inmates receive twenty days off their sentences for every month served, while Class 1 inmates receive thirty days off for every thirty days served. At Cummins, Sasser was assigned to kitchen work. Kitchen detail could include all aspects of food preparation, though the actual work Sasser performed is not evident from his records. Sasser was subsequently transferred to the Varner Unit, where he was assigned to inside building utility, and then to inside maintenance. As part of the building utility crew, Sasser was responsible for cleaning, including windows, mopping, and scrubbing walls. After approximately a month on the building crew, Sasser was reassigned to inside maintenance, which is responsible for plumbing, electrical wiring, leaks, and other similar duties. Inmates on inside maintenance have greater freedom to travel the facility, and may have contact with female staff. Sasser maintained Class 1 status for 12 months while on inside maintenance, and was further awarded meritorious good time credit for on-the-job training as an electrician and for showing proficiency and excellence in his job as an electrician. This award is evidence that Sasser was doing his job as required and was not abusing sick call. Sasser remained in this job until he was transferred to the Wrightsville Unit in 1992. At Wrightsville, Sasser was assigned to furniture manufacturing as a saw operator. In this job, he had to cut wood to specification so that the pieces could be collected for later assembly. Sasser was awarded good time credit for his work as a saw operator, which meant he had no re-

cuts or wasted wood.  Sasser remained on this job for six months before being transferred to the prerelease program in December of 1992.

Harris testified that prerelease was designed to prepare inmates within 90 to 120 days of release for returning to and functioning in the "free world."  Prerelease included classes on interview skills, balancing a checkbook, obtaining a driver's license, and other similar aspects of daily life.  Sasser remained in this program for three months.

When Sasser returned to the Arkansas Department of Custody as a death row inmate, he did not process through the diagnostic unit, but went straight to an isolation cell.  He was monitored for the first week, provided with a handbook, and told about the grievance process.  He was then placed on death row and had no contact with general population inmates.

F.       **Sergeant Cartwright's Testimony**

Sergeant John Cartwright was the maintenance supervisor at the Varner Unit when Sasser was a member of the work crew during his prior period of incarceration.  Cartwright testified that he supervised up to eight inmates at a time, and supervised Sasser for three years.  Cartwright recalled that Sasser did a good job on the maintenance crew and never had problems.  Sasser was on call for this job twenty-four hours per day, and might be called out to make nighttime repairs with the unit's security guard.  Sasser used a set of tools assigned to him and kept separately from other inmates' tools.  Tools were to be counted before an inmate left a job, and locked up until they were needed again.  Sasser never lost a tool, and Cartwright recommended Sasser for good time credit due to his performance as an electrician.

G.       **Mr. Hollinger's Testimony**

Brian Hollinger started the prerelease program at the Wrightsville Unit.  He testified the program included computer training and interview skills, would help inmates update their taxes,

and would prepare inmates for the written portion of the driver's license exam. This preparation consisted of two to three days in a classroom environment studying the driver's license manual, a practice test designed by Hollinger, and then an actual examination administered by an Arkansas State Patrol trooper at the Wrightsville Unit. Sasser took the driver's license exam one time, and scored perfectly on both the sign portion and the written portion. This was the only exam he was given in prerelease, and no evaluation was done to see if Sasser understood the program as a whole.

### H.    Dr. McGrew's Testimony[6]

Dr. Kevin McGrew was the director of the Institute for Applied Psychometrics at the time of the 2010 hearing. The Institute for Applied Psychometrics is a corporation developed to create measures of intelligence and achievement in psychometric consultation and research on intelligence. Dr. McGrew testified about his disagreements with Dr. Moore's expert report and

---

[6] In its order (Doc. 163) following the 2010 hearing, the Court (Hon. Jimm L. Hendren) ultimately declined to consider Dr. McGrew's testimony. The Court determined that Dr. McGrew's testimony was offered as rebuttal testimony to Dr. Moore's testimony to educate the Court on the standard and measures for mental retardation and not to offer an opinion on whether Sasser met the standard for mental retardation. The Court found Dr. Moore's testimony credible and persuasive and saw no need for Dr. McGrew's testimony.

Judge Hendren was better positioned than the undersigned to evaluate Dr. Moore's credibility, so the Court will rely on the finding that Dr. Moore was credible. In light of the Eighth Circuit's opinion in *Sasser II*, however, it is clear that Dr. Moore misunderstood the *Atkins* standard. "Dr. Moore testified that the 'cutoff of mental retardation' was a score of 70." *Sasser II*, 735 F.3d at 840. This is clearly incorrect, both legally and medically. "Under Arkansas law, mental retardation is not bounded by a fixed upper IQ limit, nor is the first prong a mechanical 'IQ score requirement.'" *Id.* at 844 (citing *Anderson v. State*, 163 S.W.3d 333, 355–56 (Ark. 2004)). Furthermore, "it is possible to diagnose Mental Retardation in individuals between 70 and 75 who exhibit significant deficits in adaptive behavior." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 39, 41–42 (4th ed., Text Revision 2000).

Judge Hendren did not reject Dr. McGrew's testimony based on a finding that Dr. McGew was *not* qualified or *not* credible, but because Judge Hendren did not find that testimony useful. Even if his methodology is not suspect, Dr. Moore's misunderstanding of the DSM and Arkansas legal standards for mental retardation undermines his conclusions about Sasser's intellectual functioning sufficiently for the Court to consider the substance of Dr. McGrew's testimony on remand.

criticisms of Dr. Moore's methodology. Dr. McGrew criticized Dr. Moore's suggestion that the ASVAB is a good proxy of Sasser's general intelligence because it is an aptitude test, and not an intelligence test. Dr. McGrew also testified that scoring adjustments on the basis of the Flynn effect are best practice (even according to the authorities on which Dr. Moore relied) and that it is incorrect to equate obsolete norms to variables like demographic factors. Dr. McGrew testified that adjusting a score downward three points for every decade provides the best estimate of the Flynn effect when trying to determine what someone's IQ was in the past. Finally, Dr. McGrew testified that because the 2010 test was administered closer in time to the time at which it was normed, it was more reliable than the 1994 test.

## IV.    Analysis

In determining whether execution of a defendant due to his intellectual disability is prohibited by the Eighth Amendment, courts recognize the benefit of being informed by the expertise of the medical profession. *See Hall v. Florida*, 134 S.Ct. 1986, 2000 (2014) ("The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework."). Both Arkansas's legal standard for measuring intellectual disability and the clinical definition of mental retardation utilized by the experts and parties in the hearing require "significantly subaverage intellectual functioning." *See* American Psychiatric Association (APA), *Diagnostic and Statistical Manual of Mental Disorders*, 39, 41–43 (4th ed., Text Revision 2000) (*hereinafter "DSM-IV-TR"*). A demonstration by Sasser that he met the mental retardation standard at the time the crime was committed, or that he will meet the standard at the presumptive time of execution, entitles him to habeas relief. *See Sasser II*, 735 F.3d at 846 ("As interpreted by the Arkansas Supreme Court, the Arkansas statute thus overlaps with the Eighth Amendment, precluding the execution of an individual who can prove mental

retardation *either* (a) at the time of committing the crime *or* (b) at the presumptive time of execution."). No execution has yet been set, and so there is no presumptive time of execution. The Court's analysis is limited to whether Sasser demonstrated at the hearing that he met Arkansas's mental retardation standard at the time he committed the crime.

To succeed, Sasser must prove by a preponderance of the evidence that at the time he committed the crime he exhibited significantly subaverage general intellectual functioning and a significant deficit or impairment in adaptive functioning, the symptoms of which manifested no later than the age of eighteen,[7] and that he exhibited a deficit in adaptive behavior.

## A. Significantly Subaverage General Intellectual Functioning, Manifesting No Later Than the Age of Eighteen

The first and third prongs of Arkansas's mental retardation standard require Sasser to show he had significantly subaverage general intellectual functioning at the time he committed the crime, and that this significantly subaverage general intellectual functioning manifested no later than the age of eighteen. Ark. Code Ann. § 5-4-618(a); *Sasser II*, 735 F.3d at 843. Sasser points to his IQ score as evidence that these prongs are met. An IQ score often provides evidence of a person's level of general intellectual functioning. *Hall v. Florida*, 572 U.S.--, 134 S.Ct. 1986, 1994 (2014). "The *DSM-IV-TR* includes 'an IQ of approximately 70 or below' in its definition of mental retardation." *Sasser II*, 735 F.3d at 843 (quoting *DSM-IV-TR*, at 39). A diagnosis of mental retardation cannot be justified solely on the basis of a fixed score, however, and even individuals with IQ test scores in the 70–75 range can be diagnosed as mentally retarded. *Sasser II*, 735 F.3d at 843 (citing AAIDD, Intellectual Disability: Definition, Classification, and Systems of Support 40 (11th ed. 2010); *Atkins v. Virginia*, 536 U.S. 304, 309 n.5 (2002); *Jackson v. Norris*, 615 F.3d

---

[7] Sasser was born October 21, 1964 (Petitioner's Ex. 1, Vol. 1, Tab 13). He turned eighteen years old in 1982.

959, 965 n.7 (8th Cir. 2010)).

"The first prong of Arkansas's mental retardation standard is consistent with clinical definitions of mental retardation." *Sasser II*, 735 F.3d at 843. A legal finding of mental retardation "is not bounded by a fixed upper IQ limit, nor is the first prong a mechanical 'IQ score requirement,'" though an IQ score of 65 or below establishes a rebuttable presumption of mental retardation. *Id.* at 844. In addition to an IQ score, the Court must consider "all evidence of Sasser's intellectual functioning." *Id*. at 847. This can include medical records, mental evaluations, evidence of malingering, academic performance and records, reading levels, and other testing performance. *See, e.g.*, *Weston v. State*, 234 S.W.3d 848, 857 (Ark. 2006); *Anderson v. State*, 163 S.W.3d 333, 355–56 (Ark. 2004); *Sanford v. State*, 25 S.W.3d 414, 419 (Ark. 2000); *accord Hall*, 134 S.Ct. at 1994 (recognizing that the medical community accepts "medical histories, behavioral records, school tests and reports, and testimony regarding past behavior and family circumstances" as "probative of intellectual disability, including for individuals who have an IQ test score above 70").

Here, the Court is presented with two IQ scores.[8] On the 2010 WAIS-4 administered by Dr. Toomer, Sasser scored an 83. Applying a standard margin of error, the range of this score would be 78–88. Dr. Toomer maintained that the score was inflated due to the "artificial environment" of prison, and so Sasser's actual general intelligence would merit a lower score. Because the WAIS-4 was normed more closely in time to the time it was administered to Sasser, Sasser's WAIS-4 IQ score is more likely to accurately reflect his intelligence as compared to the

---

[8] Mary Pat Carlson administered a WAIS-R test to Sasser in 1994. Sasser scored a 90 on the full-scale IQ test. However, experts for both parties agree that the score should be disregarded because the test was administered shortly after Dr. Blackburn had administered the WAIS-R, and it is inappropriate to administer tests so closely in time because the score on the second test can improve due to the "practice effect."

general population in 2010. On the 1994 WAIS-R administered by Dr. Robert Blackburn, Sasser scored a 79. Because the WAIS-R had been normed in 1980, Sasser's 1994 IQ score did not reflect his intelligence as compared to the general population in 1994, but as compared to the group against which it was normed. Testimony from Toomer and McGrew justifies adjusting the score downward three points for every ten years. Dr. Moore agreed with the accuracy of the 1994 WAIS-R result, but testified that a downward score adjustment was inappropriate.

Because the 1994 WAIS-R was administered to Sasser 14 years after it was normed, Dr. Toomer accounted for the Flynn effect by adjusting the score downward by 4 points, to 75. Accepting Dr. Toomer's downward adjustment and accounting for the standard margin of error, Sasser's score range from 1994 would be 70–80. A score of 70 or below meets the definition of "significantly subaverage intellectual functioning" under the *DSM-IV-TR*. *DSM-IV-TR*, at 41. Because of the 5-point margin of error, it is possible to diagnose mental retardation under the *DSM-IV-TR* in individuals with IQ scores between 70 and 75 who exhibit significant deficits in adaptive behavior, and individuals with scores lower than 70 who do not exhibit significant deficits or impairments in adaptive functioning will not be diagnosed with mental retardation. *DSM-IV-TR*, at 41–42. While IQ scores are not conclusive evidence of intellectual functioning, Sasser's scoring ranges on both of these tests generally fall in the range described as "borderline intellectual functioning" rather than mental retardation. *See Testimony of Dr. Toomer*, TR p. 77-80.

In addition to Sasser's IQ scores, the Court was presented with certain aptitude and achievement tests which Dr. Moore testified supported a finding of "impaired cognitive functioning" rather than mental retardation. *See Testimony of Dr. Moore*, TR p. 168. For example, Dr. Moore pointed to Sasser's 1986 score on the AFQT. Dr. Moore testified that the AFQT score, while not an intelligence test, correlated with classical IQ measures. *Testimony of Dr. Moore*, TR

p. 182. The Court has reviewed Sasser's ASVAB and AFQT scores from 1986, when Sasser was 21 or 22 years old. *See* Petitioner's Ex. 1, Vol. 1, Tab 14. The AFQT score is determined using scores from verbal, arithmetic reasoning, and math knowledge ASVAB questions. Sasser's AFQT score was 21 on a scale of 1 to 99, with 99 being the highest score. The AFQT scoring formula has changed since 1986, and if his raw scores were processed in 2010, he would have received an AFQT score of 19. The Court has also notes that with the exception of Sasser's general science score, all of his ASVAB scores were within one standard deviation (10 points) of the mean (50 points).

In the 11th grade, Sasser scored in the 10th percentile on the SRA test. This was a group-administered test made up of a number of small tests across a range of subject areas. (Doc. 157, pp. 181–82); Respondent's Ex. 1, Vol. 1, Tab 1, pp. 8–9. At the time of his 1989 conviction, Sasser was administered the Minnesota Multiphasic Personality Inventory (MMPI). While this test does not measure intelligence, Sasser's ability to complete it with a valid response profile indicates he was able to read at a 6th to 8th grade level and understand the questions.

Sasser's high school transcript reflects that he took a number of "practical" courses, which were courses for lower functioning students who were not identified as either educable mentally retarded or trainable mentally retarded. Respondent's Ex. 1, Vol. 1, Tab 1, p. 4; Petitioner's Ex. 1, Vol. 1, Tab 15. Sasser was not in special education courses. Respondent's Ex. 1, Vol. 1, Tab 1, p. 5. Sasser generally performed poorly in the standard level courses he took. In 9th grade, he received Ds and Fs in civics, science, and farm manager courses. In 10th grade, he received Ds and Fs in farm manager, English II, art, and biology courses. In 11th grade, he received Ds and Cs in American history, civics, communications, and English II courses. In 12th grade, he received Cs, Ds, and Fs in American Government, agriculture II, art II, typing, adult living, and consumer

education courses. There were some exceptions to his below-average grades in standard courses, as when Sasser received a C in his second semester of 10th grade art, or Bs and Cs in home economics. In his "practical" courses—math and English—Sasser received a greater diversity of grades. In 9th grade, he received Ds in practical math and a B and C in his practical English semesters. In 10th grade, he received Cs and Ds in practical math II. In 11th grade, he received an A and a C in his practical English III semesters. In 12th grade, he received a B and a D in his practical English IV semesters.

The Court took evidence about Sasser's childhood, education, employment, financial abilities, and personal relationships. The vast majority of this evidence reveals that Sasser did not appear to be intellectually disabled to the point of mental retardation to most people who knew him, but suffered from a lack of motivation when disinterested and an environment where he could not receive sufficient assistance or encouragement to improve his academic performance.

The Court took evidence that Sasser functioned well in the Arkansas Department of Correction just two years before the crime, working, successfully, as an electrician and in furniture manufacturing, as saw operator. Sasser completed a pre-release program prior to his release from the Arkansas Department of Correction, earning his driver's license. After his release, and just prior to the crime, Sasser found employment in a lumber mill, and purchased a truck.

The evidence overall reveals that by most measures, Sasser was intellectually disabled to some degree when he committed the crime, insofar as he had subaverage general intelligence. Because "cognitive IQ . . . tends to remain a more stable attribute," it is likely that Sasser had subaverage general intelligence since before the age of eighteen. *DSM-IV-TR*, at 42. Looking at the various instruments used to measure that general intelligence, however, only the score from the most extreme lower end of the IQ scoring range from an IQ test that required adjustment for

the Flynn effect indicates that Sasser's subaverage general intelligence had any statistical significance. Sasser's other test scores, and his school performance, further indicate he had subaverage general intelligence that nevertheless was not so subaverage as to meet the standard for mental retardation. But as explained in *Sasser II*, the Court's evaluation cannot rely on statistically significant IQ scores alone. *Sasser II*, 735 F.3d at 844; *see also DSM-IV-TR*, at 42 ("Impairments in adaptive functioning, rather than a low IQ, are usually the presenting symptoms in individuals with Mental Retardation."). Because impairments in adaptive functioning, rather than an IQ score, are the clearest indicators of intellectual disability, it is the Court's view that if Sasser demonstrated a significant deficit or impairment in adaptive functioning manifesting no later than the age of eighteen, then that would be evidence Sasser's inarguably subaverage general intelligence—as measured by IQ testing, school grades, and other similar markers—was significantly subaverage.

Because the Court finds below that Sasser has not met his burden to show that he had a significant deficit or impairment in adaptive functioning manifesting no later than the age of eighteen, the Court also finds here that Sasser has failed to show he had *significant* subaverage general intelligence that manifesting no later than the age of eighteen. He therefore cannot demonstrate that his intellectual disability in 1993 met the Arkansas legal standard for mental retardation.

**B.      Significant Deficit or Impairment in Adaptive Functioning, Manifesting No Later Than the Age of Eighteen**

The second and third prongs of Arkansas's mental retardation standard require Sasser to show he had a significant deficit or impairment in adaptive functioning at the time he committed the crime, and that this significant deficit or impairment in adaptive functioning manifested no later than the age of eighteen. Ark. Code Ann. § 5-4-618(a); *Sasser II*, 735 F.3d at 843. "The

second prong is met if an individual has '*significant limitations* in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'" *Jackson v. Norris*, 615 F.3d at 962 (emphasis added) (quoting *DSM-IV-TR*, at 41).[9]  "[T]he Arkansas standard does not ask whether an individual has adaptive strengths to offset the individual's adaptive limitations." *Sasser II*, 735 F.3d at 845.  With respect to adaptive functioning, the *DSM-IV-TR* notes that impairments in this category, rather than general intelligence, "are usually the presenting symptoms in individuals with Mental Retardation." *DSM-IV-TR*, at 42. "*Adaptive functioning* refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." *Id.*  The *DSM-IV-TR* identifies a number of instruments that can score a person's adaptive functioning in each of the various areas identified in *Jackson*, but these instruments are intended to score that adaptive functioning at the time they are administered, and may not provide an accurate reflection of an individual's past adaptive

---

[9] Sasser points out a difference in the *deficit or impairment prong* as set forth in the updated definition of intellectual disability in the *DSM-V*.  The *DSM-V* contains the following requirement for intellectual disability:

> Deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility. Without ongoing support, the adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community.

Although Sasser argues that the updated definition should be applied, the Court, notes that the *DSM-V* was published several months before the Eighth Circuit opinion in *Sasser II*, and that Court continued to rely on the factors as stated in the *DSM-IV-TR*.  This Court will likewise rely on the *DSM-IV-TR*, but finds that the same decision would be reached under both definitions.

functioning.  This may be because "[p]roblems in adaptation are more likely to improve with remedial efforts than is the cognitive IQ, which tends to remain a more stable attribute." *DSM-IV-TR*, at 42.

In his *Atkins* brief following remand, Sasser relied on evidence of his deficits or limitations in functional academic skills, work, and social/interpersonal skills to argue that he meets these prongs of the Arkansas mental retardation standard.  (Doc. 187, pp. 16–22).

### 1.     Academic Skills

Sasser relies on evidence that shows that he was in remedial or special courses throughout his school years to prove a significant limitation in his academic skills.  Sasser argues that he was failing middle school, but was socially promoted to high school, that he was in the most basic courses and could not perform well even with time and assistance, that his teachers believed he was "just not there mentally," and that he did not graduate from high school, but was instead given a certificate of attendance.  (Doc. 187, pp. 16–18).  Sasser also points to the fact that he did not obtain a qualifying score on the ASVAB for entry into the military.

All of this evidence demonstrates that any academic problems Sasser had manifested before the age of eighteen.  It does not, however, demonstrate that any limitations were significant at the time the crime was committed.  There is not much evidence of Sasser's academic skill that is contemporaneous with his crime.  Sasser received his certificate of attendance from high school in the spring of 1983 and took the ASVAB in 1986.  In 1993, just prior to release from his first period of incarceration, Sasser participated in a prerelease program that would have dropped him had he not been highly motivated to participate.  A short portion of that program is geared towards helping inmates obtain driver's licenses.  Sasser was able to take a practice test, learn in a classroom environment for two days, and then study for and pass the official written and sign

portions of the driver's license exam. While it was only for a short term, Sasser's success in this area undermines his argument that his academic skills were *significantly* limited at the time of the crime, and is consistent with evidence that Sasser could perform academically when he was motivated to do so. *See, e.g.*, Respondent's Ex. 1, Vol. 1, Tab 1, p. 5 ("Mr. Sasser indicated that he generally enjoyed school, but had trouble paying attention in some classes. He also noted that his mother did not have sufficient education to help him with school work that he did not understand, so if he experienced difficulty with a concept covered in class, he did not have additional parental help for clarifying it. A close school friend, Karl Sensley, echoed this description, describing Mr. Sasser as more capable than his grades reflected, but noting that low motivation and little academic encouragement or demand from home resulted in poor scholastic effort."). The Court is mindful that it is an open question whether strengths in one area of adaptive functioning can be weighed against weaknesses in the same area when analyzing whether a person has limitations in that area. *See Moore v. Texas*, 581 U.S--, 137 S.Ct. 1039, 1050 n.8 (2017) ("The dissent suggests that disagreement exists about the precise role of adaptive strengths in the adaptive-functioning inquiry. But even if clinicians would consider adaptive strengths alongside adaptive weaknesses within the same adaptive-skill domain, neither Texas nor the dissent identifies any clinical authority permitting the arbitrary offsetting of deficits against unconnected strengths . . . ." (internal citation omitted)). The Court is further mindful that ordered environments like prison may result in artificial improvements to adaptive functioning. *See id.* at 1050 ("Clinicians, however, caution against reliance on adaptive strengths developed 'in a controlled setting,' as a prison surely is." (citation omitted)). The Court does not view evidence of Sasser's performance in prison in adaptive functioning as evidence of improved adaptive functioning, but rather as evidence undermining Sasser's claimed limitations in areas of adaptive functioning prior

to incarceration. The Court takes this view in light of multiple reports that Sasser may have suffered as much from a lack of motivation as a lack of ability.

Because Sasser's evidence of limitations in the area of academic skills is primarily limited to his school career rather than to nearer the time of the crime, and because that evidence is called into question by reports and evidence that Sasser's performance was due at least in part to a lack of motivation, rather than to limitations in adaptive functioning, Sasser has not met his burden to demonstrate by a preponderance of the evidence that he had a significant limitation in academic skills at the time he committed the crime.

### 2.    Work

Sasser relies on evidence that shows he had manual labor and low-responsibility jobs to prove a significant limitation in his work. Sasser points to his employment at Hudson Foods (now Tyson Chicken) as evidence for this limitation. Sasser's supervisors recalled that even simple tasks like color-coded box stacking eluded him. Ultimately, Sasser was placed in a position where his job was to press a button to dispense ice from a machine, and was not fired from Hudson simply because Hudson needed as much help at the time as it could get. Sasser also points to his more recent employment as a stacker at Whistle Lumber Company, where Sasser was employed following his first incarceration. "Stacker" is the most basic position at the lumber mill, requiring the employee only to stack boards that have already been graded for quality into their appropriate stacks, but Sasser's foreman recalled that Sasser consistently could not even perform that job adequately. At both Hudson and Whistle, Sasser was deemed unfit for positions that required judgment, multitasking, or abstract thinking. Sasser was also a pipe joiner at J.K. Young Construction for a period of time, a position his brother testified was comparable to being the shovel man in construction work. The job consisted of manual labor involving a repetitive, simple

task.

    This evidence must be weighed against other evidence that Sasser was able to function adequately at work in order to determine whether Sasser has proven a significant limitation in the area of work at the time the crime was committed.[10]  For example, Dr. Moore's expert report cited interviews with the Crank family, for whom Sasser worked when he was an adolescent.  Sasser's job for the Cranks involved manual labor farm tasks like hay baling and working the chicken houses.  Mr. Crank reported that Sasser was capable of independent farm work, and would do it if he found it engaging.  During his first period of incarceration (which was prior to his job at the Whistle Lumber Company), Sasser worked first for building utility, cleaning and sanitizing the facility.  Sasser then moved to inside maintenance from May of 1989 to June of 1992.  Sasser was able to perform in that job with various levels of supervision (which depended on the tools each task required, rather than on Sasser's need for supervision).  Sasser worked as an electrician on the inside maintenance crew, and demonstrated proficiency and excellence in that job, receiving satisfactory work results.  Sasser then transferred to the Wrightsville Unit, where he worked in furniture manufacturing as a saw operator, cutting wood to particular specifications.  Sasser was awarded credit toward his sentence in these positions, which could only be given if he was doing the job each position required him to do.  This indicates that in work, as in academic skills, Sasser's apparent limitations may be due more to a lack of engagement or motivation than to a significant limitation.  As a result, Sasser has not demonstrated by a preponderance of the evidence that he had a significant limitation in the area of work.  In light of his reported capabilities while working

---

[10] Again, the Court is not weighing evidence of strengths against evidence of limitations to see whether Sasser had more strengths than limitations in any given area, but is weighing evidence of strengths against evidence of limitations in order to see whether Sasser has met his burden to show that he actually was limited in any given area.

for the Cranks, Sasser has also not shown that any limitation manifested before the age of eighteen.

### 3. Social/Interpersonal Skills

Sasser relies on evidence of his behavior in junior high sports and in school, his lack of a girlfriend in high school, and his general inability to connect with peers to prove a significant limitation in social and interpersonal skills. Sasser's junior high coach testified that Sasser stared blankly during conversations, did not laugh at jokes told by his coach unless the coach first laughed, remained by himself most of the time, and would engage in negative behavior to get the other students to laugh at him. Other teachers and students indicated that Sasser did not have many friends, laughed inappropriately, and was treated as a nerd or weird student. Sasser was purportedly not the type of high school boy that a girl would pick as her boyfriend.

Assuming this evidence demonstrates a significant limitation in social and interpersonal skills, it is clear that it manifested before the age of eighteen. Sasser does not, however, persuade the Court that this evidence demonstrates such a significant limitation. Evidence that an adolescent will not engage in conversation with a coach or laugh at the coach's jokes without the coach laughing first is as easily ascribed to the adolescent being intimidated by the coach as having a significant limitation in social and interpersonal skills. Evidence that an adolescent is not liked by his peers, is considered a nerd or weird, and does not have a girlfriend is also not good evidence for a significant limitation in social or interpersonal skills. Furthermore, this inadequate evidence is not the only evidence bearing on Sasser's social and interpersonal skills. Interviews conducted by Dr. Moore in advance of his report indicate that Sasser had friends in school, did have a high school girlfriend, was a good storyteller, and was a class clown around his peers (consistent with Coach Blake's testimony that Sasser would do negative things or get in trouble just to get a laugh), even if he was quiet in more structured settings. Sasser also had a girlfriend whom he interacted

with prior to his first incarceration, and began to date consistently after his first incarceration, and with whom he fathered a child around the time he committed this crime. She reported to Dr. Moore that Sasser showed concern for her and asked her how she was doing. This concern is reflected in the March 4, 1992 letter Sasser sent her. Petitioner's Ex. 1, Vol. 1, Tab 16. Reports to Dr. Moore also indicated that Sasser remembered birthdays and holidays and would buy gifts on these occasions.

Sasser has not demonstrated by a preponderance of the evidence that he had a significant limitation in social and interpersonal skills at the time he committed the crime.

### 4.    DSM-V

Sasser points out a difference in the *deficit or impairment prong* as set forth in the updated definition of intellectual disability in the Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (*hereinafter* "*DSM-V*"). The *DSM-V* contains the following requirement for intellectual disability:

> Deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility. Without ongoing support, the adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community.

(Doc. 187, p. 7 (quoting *DSM-V*, at 33)). Sasser argues that the updated definition should be applied because it reflects the medical community's current opinion with respect to diagnosis of intellectual disability. (Doc. 187, p. 6). The updated definition involves three domains of adaptive functioning—conceptual, social, and practical—and explains there is a significant deficit or impairment in adaptive functioning "when at least one of these three domains 'is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, work, at home, or in the community.'" (Doc. 187, p. 9 (quoting

*DSM-V*, at 38.)).    Sasser's brief omits the next sentence, which admonishes that "[t]o meet diagnostic criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the intellectual impairments described in Criterion A."

In making his argument that the Court must rely on the *DSM-V*, Sasser overstates the necessity of relying on the medical community's current diagnostic tools.    "The legal determination of intellectual disability *is distinct from a medical diagnosis*, but it is *informed by* the medical community's diagnostic framework."   *Hall*, 134 S.Ct. at 2000 (emphases added).  Current application of that framework supplies "one constraint on States' leeway" in defining intellectual disability.  *Moore*, 137 S.Ct. at 1053.  Updated medical manuals "[r]eflect[] improved understanding over time."  *Id.*  None of this is to say that it is incumbent upon a State to rely on an updated diagnostic manual if the updates do not reflect a substantive departure from the outdated diagnostic manual that is relevant to the analysis conducted in a particular case.  *Cf. id.*, at 1050 ("The CCA's consideration of Moore's adaptive functioning also deviated from prevailing clinical standards *and from the older clinical standards the court claimed to apply*." (emphasis added)).  With respect to intellectual disability, updates in the *DSM V* are intended to "ensure[] that [IQ scores] are not overemphasized as the defining factor of a person's overall ability, without adequately considering functioning levels."    American Psychiatric Association, *Intellectual Disability Fact Sheet*, at 1–2 (2013) (*available at* https://www.psychiatry.org/ File%20Library/Psychiatrists/Practice/DSM/APA_DSM-5-Intellectual-Disability.pdf)    (*last accessed* Feb. 27, 2018).  With respect to adaptive functioning, the updates are intended to "ensure that clinicians base their diagnosis on the impact of the deficit in general mental abilities on functioning needed for everyday life."  *Id.* at 2.

The adaptive functioning updates in the *DSM V* categorizing adaptive functioning into

conceptual, social, and practical domains overlap with the adaptive functioning standards employed by the AAIDD. *See Moore*, 137 S.Ct. at 1050 (explaining AAIDD inquiry looks for significant limitations in conceptual, social or practical skills). Dr. Toomer, Sasser's own expert, testified that the three categories used by the AAIDD are "not really" significantly different, and are "basically the same," as the *DSM-IV-TR* categories. (Doc. 157, p. 49). And as *Sasser II* makes abundantly clear, IQ scores are not definitive of significantly subaverage general intelligence, but merely a consideration in analyzing whether deficits in general mental abilities exist. Because Sasser does not show that updated medical standards in the *DSM-V* updates have any bearing on his case, the Court is not convinced that it is required to rely on the *DSM-V* diagnostic framework, rather than the *DSM-IV-TR* diagnostic framework, in determining whether Sasser has an intellectual disability.

Nevertheless, because *Sasser II* correctly limits overreliance on IQ scores and because Dr. Toomer testified there are no significant differences in the updated adaptive functioning framework, the Court finds that for the same reasons Sasser could not prove that he had a significant limitation in academic skills (now heavily centered in the conceptual domain), work (now heavily centered in the practical domain), or social/interpersonal skills (now heavily centered in the social domain), he cannot prove that any he had any limitation in these areas that sufficiently impaired him that ongoing support was needed in order for him to perform adequately at school, work, home, or in the community in a way that can be attributed to any limitation in general intellectual functioning.

## C.      Deficit in Adaptive Behavior

The fourth prong of Arkansas's mental retardation standard requires Sasser to prove a deficit in adaptive behavior. Ark. Code Ann. § 5-4-618(a); *Sasser II*, 735 F3d at 843. "The fourth

prong largely duplicates the second prong, but places 'no age requirement on the evidence used to establish limitations in adaptive behavior.'" *Sasser II*, 735 F.3d at 846 (quoting *Jackson v. Norris*, 615 F.3d 959, 967 (8th Cir. 2010)). To satisfy his burden under this prong, Sasser need only show that he had a significant deficit in adaptive behavior at the time of the crime, whether or not it manifested before the age of eighteen. Because Sasser does not rely on any additional evidence other than that put forward under the second prong, he cannot show that he had a deficit in adaptive behavior as required by the fourth prong.

## V.    Conclusion

Because Sasser has not demonstrated by a preponderance of the evidence that he meets Arkansas's legal standard for mental retardation, he has not shown that at the time of the crime he fell "within the range of mentally retarded offenders about whom there is a national consensus." *Atkins*, 536 U.S. at 317. Sasser has not demonstrated that the Eighth Amendment prohibits his execution on account of intellectual disability at the time the crime was committed.

Because the Court is addressing the ineffective assistance of counsel issue in a separate opinion, a final order incorporating both opinions will be entered separately.

ENTERED this 2nd day of March, 2018.

/s/ *P. K. Holmes,* III
P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE